

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-14-2004

# Gibbs v. Frank

Precedential or Non-Precedential: Precedential

Docket No. 02-3924

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Gibbs v. Frank" (2004). *2004 Decisions.* Paper 171.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/171

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

No. 02-3924

BARRY GIBBS,

Appellant

v.

FREDERICK K. FRANK; DISTRICT
ATTORNEY OF PIKE COUNTY;
ATTORNEY GENERAL OF
PENNSYLVANIA

On Appeal from the United States
District Court for the
Middle District of Pennsylvania
(Dist. Court No. 99-cv-01627)
District Judge: Hon. Edwin M. Kosik

Argued: June 22, 2004

Before: NYGAARD, MCKEE and
CHERTOFF, *Circuit Judges.*

(Filed: October 14, 2004)

Mark A. Berman, Esq. (Argued)
Gibbons, Del Deo, Dolan, Griffinger &
Vecchione
One Riverfront Plaza
Newark, NJ 07102-5497

*Counsel for Appellant*

Gerald J. Pappert
Attorney General
Richard A. Sheetz, Jr.
Executive Deputy Attorney General
Director, Criminal Law Division
Amy Zapp
Chief Deputy Attorney General
Appeals and Legal Services Section
Frank G. Fina (Argued)
Senior Deputy Attorney General
Appeals and Legal Services Section
Office of Attorney General of
Pennsylvania
16th Floor-Strawberry Square
Harrisburg, PA 17120

*Counsel for Appellee*

OPINION OF THE COURT

CHERTOFF, *Circuit Judge*.

Appellant Barry Gibbs appeals from the District Court's judgment denying his petition for a writ of habeas corpus. Gibbs, who is currently serving a sentence of twenty to forty years imprisonment, argues that the state court's decision was contrary to or an unreasonable application

of clearly established federal law. We agree and reverse.

## I.

In March of 1984 the Commonwealth of Pennsylvania charged Gibbs with, inter alia, criminal homicide for shooting and killing a security guard named George Mehl. The Commonwealth charged that Gibbs shot Mehl after a woman named Sharon Burke hired him to kill her husband, Wayne Burke, who was also a security guard. Mehl was shot as he sat beside Burke while they were both at work.

Prior to his trial in the Court of Common Pleas of Pike County, Gibbs petitioned the state judge to appoint an expert to explore the possibility of raising a mental infirmity defense. The court appointed Dr. Anthony Turchetti. Following Turchetti's evaluation, Gibbs notified the Commonwealth that he in fact intended to raise a mental infirmity defense at trial.

The Commonwealth consequently secured an order from the court requiring Gibbs to submit to an examination from a state psychiatrist, Dr. Robert Sadoff. Sadoff gave Gibbs Miranda warnings prior to the examination, and Gibbs thereafter made several inculpatory statements.

At the trial, Gibbs offered expert testimony from Turchetti to support a diminished capacity defense, and the Commonwealth called Sadoff as a witness to rebut Turchetti's testimony. The jury found Gibbs guilty and sentenced him to death. The Pennsylvania Supreme Court eventually reversed Gibbs's conviction on grounds unrelated to this appeal, see Pennsylvania v. Gibbs, 553 A.2d 409 (Pa. 1989), and the Commonwealth thereafter retried Gibbs.

Gibbs decided not to pursue a mental infirmity defense at his second trial. The defense decided instead to contest identity—that is, to raise doubt that it was Gibbs who shot George Mehl. Nonetheless, the Commonwealth moved in limine for permission to call Sadoff as a witness to testify about the inculpatory statements Gibbs made to him. The court granted the Commonwealth's motion under the theory that a defendant's "testimony from an earlier trial may be introduced in the prosecution's case against a defendant regardless of whether that defendant takes the stand or not in the second proceeding," because a defendant waives his right against self-incrimination by taking the stand in a previous proceeding. App. A10 (internal citations and quotations omitted). Sadoff testified at the second trial as a part of the Commonwealth's case-in-chief; he related the inculpatory statements Gibbs made to him.

The jury again found Gibbs guilty, and the Pennsylvania Superior Court affirmed his conviction and sentence. The Pennsylvania Supreme Court denied allocatur, and Gibbs brought this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Middle District of Pennsylvania. The District Court denied

the petition as to all the claims. We granted a certificate of appealability on the issue "whether Gibbs' Fifth Amendment privilege against self-incrimination was violated during his retrial when the Commonwealth was permitted to introduce Sadoff's psychiatric testimony, which had originally been offered by the Commonwealth to rebut the diminished capacity defense asserted by Gibbs at his first trial, relating incriminating statements made by Gibbs despite the fact that Gibbs did not raise that defense at his second trial."

## II.

We exercise jurisdiction under 28 U.S.C. §§ 1291 and 2253. Where (as here) a District Court relied exclusively on the state court record and did not hold an evidentiary hearing on habeas review, this Court's review is plenary. See Moore v. Morton, 255 F.3d 95, 103 (3d Cir. 2001). Like the District Court, we review the state court's determinations with the deference the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA") requires. The statute provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In addition, "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"[C]learly established Federal law, as determined by the Supreme Court of the United States" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); see also Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."). A state-court decision is "contrary to" clearly established federal law if the state court (1) "contradicts the governing law set forth in [the Supreme Court's] cases'" or (2)

3

"confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06. A state-court decision "involve[s] an unreasonable application" of clearly established federal law if the state court (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case"; or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407; see also Mitchell v. Esparza, 540 U.S. 12, 124 S. Ct. 7, 11 (2003) (per curiam); Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).

### III.

We begin by identifying the relevant Supreme Court precedents. The case law begins with Estelle v. Smith, 451 U.S. 454 (1981). There, the state judge ordered a capital defendant to undergo a psychiatric examination by a state-retained doctor. The defendant did *not* offer a defense of mental infirmity at the guilt phase of the trial, but at the capital penalty phase the state sought to offer the doctor's testimony about the defendant's admissions as proof of "future dangerousness."

The Supreme Court granted habeas relief. The Court determined that the Fifth and Sixth Amendments (through the Fourteenth) applied at the penalty phase; that the defendant's interview had been compelled and without notice to the defense attorney; and that no Miranda warnings had been given. See Miranda v. Arizona, 384 U.S. 436 (1966).[1] The Court expressly observed—in language of significance here—that before interrogation the state must provide the defendant "with an awareness of the Fifth Amendment privilege and the consequences of forgoing it." 451 U.S. at 467.

The Court in Smith emphasized that there were two "distinct circumstances" that were elements of its conclusion: The state court compelled the defendant to submit to the examination and the defendant himself never placed his mental state in issue at either the guilt or penalty phase of the trial. 451 U.S. at 468.

The Supreme Court soon addressed a case where these two circumstances did not exist in Buchanan v. Kentucky, 483 U.S. 402 (1987). There, the murder defendant's counsel and the prosecutor jointly petitioned the state court to order a psychiatric examination of the defendant to see if he should be treated during incarceration. At trial, the defendant raised a defense of extreme emotional disturbance, and the court allowed the prosecutor to use the earlier psychiatric report to rebut the defense.

---

[1] We note that Gibbs challenges the admissibility of the testimony under the Fifth Amendment, but not under the Sixth Amendment.

4

The Buchanan Court distinguished Smith, drawing on language in its earlier decision suggesting that "if a defendant requests [a psychiatric evaluation] or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." 483 U.S. at 422-23. Since, in Buchanan, defense counsel sought the examination and then placed his mental state in issue, there was no constitutional violation when the state offered the examination for a "*limited* rebuttal purpose." Id. at 424 (emphasis added).

Since Buchanan, the ruling in Smith was reaffirmed and applied to invalidate convictions in two further Supreme Court cases. Satterwhite v. Texas, 486 U.S. 249 (1988) presented facts almost identical to Smith, in that the state offered penalty phase evidence from a compelled psychiatric examination of the defendant, even though the defendant did not put his psychological state in issue. The Court held that because the examinations occurred after indictment, and without proper notice to defense counsel, there was a Sixth Amendment violation. 486 U.S. at 255-56. Powell v. Texas, 492 U.S. 680 (1989) presented a somewhat different factual pattern. There, the state examined the defendant and offered the psychiatric report at the penalty phase. The state argued that this did not run afoul of Smith because at the guilt phase the defendant himself had raised a psychiatric defense. The Court

refined what was implicit in Smith by holding that a defendant's initiation of the psychiatric issue at trial could waive a Fifth Amendment objection—but not a Sixth Amendment objection—to the state's subsequent use of a mandatory psychiatric report. As part of its analysis, the Court observed that there could be no Sixth Amendment waiver because no Supreme Court case had suggested that by "opening the door" to the admission of state psychiatric evidence in the guilt phase, the door would also "open" automatically to the admission of that evidence for a different purpose in the penalty phase. 492 U.S. at 685 n.3.

Most recently, the Supreme Court revisited this issue in the context of a habeas challenge mounted after the 1996 AEDPA habeas amendments, and under the narrower standard of review which now applies.[2] In Penry v. Johnson, Penry was charged with a 1979 capital murder. 532 U.S. 782 (2001). Earlier, in 1977, he had been subjected to a psychiatric examination requested by defense counsel for an unrelated non-capital crime. Penry placed mental state in issue both in his capital trial and in the previous trial for the earlier crime. In the capital trial, the state was permitted to use the voluntary psychiatric report from the prior trial to

_____

[2] Because the earlier Court cases discussed predate the 1996 habeas amendments, they do not address whether the state court ruling was "contrary to" or an "unreasonable application" of Supreme Court precedent.

5

impeach Penry's own psychological witness. The Supreme Court held the state court rulings not contrary to, or unreasonable in applying, prior Supreme Court precedent because it distinguished Smith. In particular, the Court underscored the following differences: In Smith, the defendant did not place his mental state in issue; in Penry he did. In Smith, the psychiatric examination was compelled by the court and conducted by a state doctor; in Penry, the defense attorney requested the examination. In Smith, the state put on the psychological evidence in its case in chief; in Penry it was limited to cross-examination. Finally, in Smith, the defendant could have been warned about the possible use of his admissions in a subsequent penalty phase; in Penry, the psychiatric examination preceded the capital crime itself, so the state could not have anticipated—or warned about—the possibility of its future use in the capital case. 532 U.S. at 794.

If we lay these decisions out, the following landscape emerges. A compelled psychiatric interview implicates Fifth and Sixth Amendment rights (Smith). Before submitting to that examination, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified (Smith). The warnings must advise the defendant of the "consequences of foregoing" his right to remain silent (Smith). The Fifth and Sixth Amendments do not necessarily attach, however, when the defendant himself initiates the psychiatric examination (Buchanan,

Penry). Similarly, the Fifth—but not Sixth—Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings (Buchanan, Powell). But that waiver is not limitless; it only allows the prosecution to use the interview to provide rebuttal to the psychiatric defense (Buchanan, Powell). Finally, the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes (Penry).[3]

How does the state court decision in this case stack up against these

---

[3] It is not clear whether this last point follows from the Fifth Amendment, as interpreted by the Supreme Court in Penry, or whether it is simply not unreasonable for a state court to apply the Supreme Court's precedent this way. The Court's decision in Penry tends to indicate the latter. 532 U.S. at 794-95. After explaining several differences between Penry's case and prior Supreme Court precedent, the Court expressly stated that it did not have to "decide whether these differences affect the *merits* of Penry's Fifth Amendment claim," because "the question is whether the [state] court's decision was contrary to or an unreasonable application of our precedent." Id. (emphasis added). We assume for purposes of this decision, however, that this last point is a matter of substantive Fifth Amendment law.

precedents?[4] Here, the defense initially indicated it would raise a psychiatric defense and accordingly the court ordered as a condition that the defendant submit to an interview by a state doctor, Robert Sadoff. Sadoff gave Gibbs Miranda warnings. During the first trial, Gibbs in fact offered insanity and diminished capacity defenses, and Sadoff testified in rebuttal. Undoubtedly, Sadoff's testimony was permissible in that trial under Smith and Buchanan. But that trial was reversed and vacated, by the Pennsylvania Supreme Court, on other grounds.

At the second trial, Gibbs presented no mental capacity defense. Sadoff was permitted to testify in the prosecution case in chief, however, simply to repeat incriminating statements that Gibbs had made in the interview.

As in Smith, Gibbs's interview with Sadoff was mandated by the state court, and Sadoff was the state-selected doctor. As in Smith, the statement was not offered at the second trial after the defense put psychiatry in issue, and it was not limited to rebuttal. In fact, the purpose for which it was offered at Gibbs's trial was not even to prove a psychological point, since the second trial presented no psychological issue before Sadoff testified. The statement was offered simply for the truth of the admissions of fact. In this sense, the psychiatric interview was used for a purpose even less justifiable than that in Smith, where at least the state's purpose in offering a psychiatric analysis at the penalty phase was to establish a psychological disposition to be dangerous in the future.

If these facts were all that were before us, we could say that the state ruling admitting the Gibbs interview in the second trial was contrary to Smith itself. But there is a crucial additional fact that makes a difference. According to the finding of the state court, Sadoff "mirandized" Gibbs. App. A17. The state argues that this takes the case out of the template of Smith altogether.[5]

---

[4] The state decision actually discussed none of these cases. But the Supreme Court has instructed that "a state court need not even be aware of our precedents 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Mitchell v. Esparza, 124 S. Ct. at 10 (quoting Early v. Packer, 537 U.S. 3, 8 (2002)).

[5] The Commonwealth asserts that Gibbs did not raise his "limited waiver" argument before the state courts or the District Court, and thus cannot do so before us. We disagree. The waiver issue was implicit in Gibbs's Fifth Amendment argument, which he has asserted throughout the state and federal proceedings. In fact, the state courts and the District Court, while not characterizing their analysis as one of waiver, based their decision on a waiver theory. See App. A48 ("In choosing to pursue a mental defense in his first trial and reap any possible benefits therefrom, the fact that he is not acquitted and is required to go

We agree that the warning takes the fact pattern outside the strict bounds of Smith, so that this case is not contrary to Smith, or any other decision. That leaves the question whether the admission of Gibbs's interview is either an unreasonable application of Smith to the facts or an unreasonable failure to extend Smith to the facts.

We initially recall that Smith explicitly held that the warnings given to a potential psychiatric interviewee must advise him of the "consequences of" waiving his Fifth Amendment rights. Under any reasonable view, this requires an accurate statement of those consequences. Thus, if Sadoff told Gibbs that his statements could be used against him only if he raised a mental state defense at trial, any waiver by Gibbs would be specific to that condition, and the only reasonable application of Smith would mandate that the statements be excluded if no such defense was raised. On the other hand, if Sadoff told Gibbs that his statement could be used against him in court for any purpose whatsoever, whether or not he offered any kind of psychological defense, then it would arguably be a general waiver, and it would be reasonable to regard Smith as satisfied. But cf. Simmons v. United States, 390 U.S. 377, 393-94 (1968) (defendant who

---

through a second trial wherein he decides not to utilize a mental defense, does not enable Gibbs to take back the voluntary statements previously given to Dr. Sadoff").

testifies at suppression hearing asserting Fourth Amendment claim does not waive his Fifth Amendment privilege and his statements cannot be used against him at trial on the issue of guilt).

The record is silent as to what Sadoff said precisely, and the state court made no factual findings in this regard, either explicit or implicit. The inference from the term of art "mirandized" is that he offered the standard language articulated in the Miranda decision. See Dickerson v. United States, 530 U.S. 428, 435 (2000). Since that warning states without limitation that "anything you say may be used against you in a court of law," one might conclude that Gibbs gave a general waiver. But Sadoff's warning did not occur in a vacuum. Everyone understood that the psychiatric interview was a court-ordered precondition to Gibbs's presentation of a psychiatric defense. More important, Pennsylvania law expressly limited the scope of any psychiatric examination waiver so that the evidence could not be used for any purpose other than a proceeding about the defendant's "mental condition." 50 Pa. Stat. § 7402(e)(3).

Accordingly, Gibbs (and his attorney) were legally entitled to understand any Miranda waiver in the context of existing state law and the procedural setting of the case. That is, that the waiver covered only use of any psychiatric interview in a proceeding in which defendant's mental state was raised by the defense. Here, the state does not contend that it was unreasonable for the

defense to assume that any Fifth Amendment waiver was predicated on the use of the statement only in a trial where psychiatric evidence was in issue. Such an assumption was dictated by the context of the examination, and the mandate of state law.

That being so, we face the ultimate question. Would it be unreasonable for a state court to read Smith as permitting the use of a "mirandized" psychiatric interview for a purpose that is utterly different than that which formed the underlying basis for the waiver? Put another way, if the interview is obtained based on an understanding of the limited consequences of Gibbs's waiver, and if the limitation is then disregarded, is use of the interview reasonable under Smith? That answer must be that it would be unreasonable.

The language of Smith itself says that the interviewee must be made aware of "the Fifth Amendment privilege *and the consequences of forgoing it*." 451 U.S. at 467 (emphasis added). Obviously a false statement of the consequences or a statement that is misleading by omission does not satisfy that standard. Cf. Moran v. Burbine, 475 U.S. 412, 423-24 (1986) (withholding information is "relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them"). It could hardly be reasonable, therefore, to hold that Smith is satisfied by securing a waiver based on

warnings that misstate the consequences of the waiver.

Two other Supreme Court decisions reinforce this conclusion. First, in Penry, the Supreme Court distinguished Smith by pointing out that at the time of Smith's psychological examination it was evident that the issue of his state of mind and dangerousness could arise at sentencing; it was therefore necessary that he be advised of this consequence before he waived his Fifth Amendment rights. Penry, on the other hand, was examined for a crime other than the capital crime he later committed; it would, therefore, have been impossible to advise him at the time of his waiver that his statements might be relevant in a future prosecution for a crime that had not yet occurred. This distinction emphasizes the importance of advising a defendant like Gibbs accurately about the foreseeable consequences of his waiver. Here, it was foreseeable that Gibbs might ultimately go to trial and opt not to raise a psychiatric defense; indeed, the foreseeability of that possibility is implicit in the state statute that limits the use of psychiatric examinations to proceedings involving a defendant's mental condition.

Second, in Powell, the Court emphasized that waivers of Fifth Amendment rights are limited to the specific consequences as to which the defendant is given notice. Powell rejected the idea that raising an insanity defense at trial would automatically waive the right to object to admission of psychiatric evidence at a penalty hearing. 492 U.S. at 685 n.3. This underscores that the scope

of the waiver must be measured in terms of the consequences about which the defendant is warned.[6] A reading of <u>Powell</u> and <u>Smith</u> that overlooked this crucial limitation would be an unreasonable application of those precedents.

## IV.

We conclude that the writ should issue here.[7] We will therefore reverse the judgment of the District Court and remand the cause for it to grant Gibbs' petition for a writ of habeas corpus and require the state to either release Gibbs or retry him within a specified time period.

---

[6] Arguably, the above-cited passage in <u>Powell</u> is dictum. We are aware that dictum in a Supreme Court opinion cannot serve to determine "clearly established law" under the habeas statute. <u>See</u> <u>Johnson v. Carroll</u>, 369 F.3d 253, 257 (3d Cir. 2004). But even if it is dictum, it offers guidance about how the Supreme Court reasonably interprets its previous decision in <u>Smith</u>, and therefore it is also relevant to determining whether a state court decision reasonably applies Supreme Court precedent. <u>Cf.</u> <u>Price v. Vincent</u>, 538 U.S. 634, 641-42 & n.2 (2003) (referencing lower federal court decisions to analyze reasonableness of state court decision); <u>Chadwick v. Janecka</u>, 312 F.3d 597, 613 (3d Cir. 2002) (lower federal court precedent relevant to determining reasonableness of state court decision).

[7] The state does not contend that admitting Sadoff's testimony did not have "'a substantial and injurious effect or influence in determining the jury's verdict.'" <u>Szuchon v. Lehman</u>, 273 F.3d 299, 319 (3d Cir. 2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993)).

10

*Gibbs v. Frank,* No. 02-3924

NYGAARD, <u>Circuit</u> <u>Judge</u>, concurring

I agree with the majority's conclusion. I, too, would reverse. I write briefly, however, to state my view of what the phrase "clearly established federal law as defined by the Supreme Court of the United States," means, and should mean. To me, the Fifth Amendment and its axiomatic injunction is clearly established federal law, and has been since *Malloy v. Hogan*, when the Supreme Court through the doctrine of incorporation ruled that the Fifth Amendment's protections applied to the states as well as the federal government. 378 U.S. 1, 6 (1964).

First, I believe that neither the Anti-Terrorism and Effective Death Penalty Act of 1996 nor *Williams v. Taylor*, 529 .S.Ct. 362 (2000), preclude us from looking to the actual text of the Constitution to determine the relevant clearly established federal law when the Supreme Court has not addressed the issue. It is my opinion that Congress' statement that a state court's decision must stand unless it is "contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" was not meant to pretermit consideration of a protection expressly provided by the Bill of Rights.

To me, a fair reading of *Williams* indicates that what the Court was establishing therein, is that it is to be its word, as opposed to that from the inferior courts, that determines federal law for the purposes of habeas review. 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar.") (Stevens, J., concurring). The Court, however, did not hold that AEDPA somehow disestablished the Constitution itself as clear federal law.

Precluding the text of the Constitution from being considered as clearly established federal law could create the anomaly of having an explicit and self-evident constitutional right that is unenforceable in habeas proceedings simply because the Supreme Court has not elaborated upon the contours of that right. It is after all the Constitution, and not the Supreme Court, that created the cherished American rights relied upon, *inter alia*, by habeas petitioners. I conclude that the clearest statement of federal law is found in the express text, and derived from the obvious intent, of the Fifth Amendment itself.

The well-known text of the Fifth Amendment itself ensures that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. I cannot believe that Congress would consider anything to be more clearly established. I certainly do not. The essence of this Amendment's language is "the requirement that the state which proposes to convict and punish an individual produce the evidence against

11

him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Smith*, 451 U.S. at 462 (quoting *Colombe v. Connecticut*, 367 U.S. 568, 581-82 (1961)). In Gibbs' second trial, when the Commonwealth introduced Gibbs' own incriminating words, thereby forcing him to "be a witness against himself," nothing could be more clear than that it violated his Fifth Amendment rights.

Finally, although I find no jurisprudential support for my position, *See e.g., Felker v. Turpin, 518 U.S. 651 663, 116 S. Ct. 2333, 2339 (1996), Green v. French, 143 F.3d 865, 875 ( 4ᵗʰ Cir. 1998),* to the extent AEDPA was actually intended by Congress to deny access by habeas petitioners to the protections of the Bill of Rights subject to a condition precedent, in my view this preclusion should be considered a suspension of the writ. Thus to the extent Congress intended to deny, or has denied, our power to provide habeas relief, it is my opinion that it has violated the Suspension Clause, Art. I, §9 of the Constitution, which, at a more enlightened time should act as a textual limit on Congress' power to withdraw jurisdiction from the federal courts to enforce Constitutional rights under the Great Writ.

In my view, a trial judge with a modest understanding of the Constitution would quickly conclude that the injunction contained in the Fifth Amendment is so clearly established that Gibbs' inculpatory statement could not be introduced into evidence against him. But because the trial court admitted the statement, it deprived Gibbs of his right against self-incrimination by violating the express language of the Fifth Amendment. Its decision was contrary to clearly established federal law; and I too, would reverse.