# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 24, 2013

Lyle W. Cayce
Clerk

No. 12-70027

CHARLES RAY CRAWFORD,

Petitioner-Appellant

v.

CHRISTOPHER B. EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS,

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:04-CV-59

Before STEWART, Chief Judge, and JOLLY and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Charles Ray Crawford, a prisoner in the custody of the Mississippi Department of Corrections, appeals the district court's dismissal of his 28 U.S.C. § 2254 motion after receiving a Certificate of Appealability ("COA") from the district court. Crawford maintains that he is entitled to habeas corpus relief because he was subject to a psychiatric evaluation without the benefit of counsel in violation of the Sixth Amendment. For the following reasons, we AFFIRM.

---

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

## FACTS AND PROCEEDINGS

In January 1993, Charles Crawford was out on bond awaiting trial on charges of aggravated assault and rape arising out of events that transpired in January 1991. Crawford had filed a notice of his intent to pursue an insanity defense for those charges, and had submitted to a psychiatric examination before Drs. Criss Lott and Reb McMichael at the Mississippi State Hospital on December 23, 1992. The doctors concluded that Crawford had no memory deficits, was able to distinguish right from wrong, and was competent to stand trial for the assault and rape charges.

On January 29, four days before Crawford's trial was set to commence, twenty-year-old Kristy Ray was abducted from her parents' home in Chalybeate, Mississippi. Kristy Ray's mother testified that when she returned home she found a window screen cut, a pallette leaning against the wall, and the phone lines severed. Kristy Ray was missing, and there was a ransom note requesting several thousand dollars and warning the family not to call the police. Ray's mother later reported that an individual had been through the drawers in her and her husband's room.

Several hours before Ray's disappearance, Charles Crawford's family discovered a ransom note in the attic of the house where Crawford was living. Concerned that Crawford was planning a kidnapping, his family approached the lawyer that they had retained to represent him on the assault and rape charges, William Fortier. Fortier contacted the police to report the possibility that a crime was being committed. He also had his law clerk turn over Crawford's mental health records to the FBI.

On the evening of January 30, officers arrested Crawford outside a residence where they were stationed. Mississippi state police officers and FBI agents administered Miranda warnings, and the FBI agents interviewed Crawford. Although he initially reported that he had been hunting, he ultimately admitted that he knew Kristy Ray was no longer alive, and agreed to

lead the authorities to Ray's body. After a walk of at least forty-five minutes through "rugged terrain," the authorities found her body with a stab wound to the heart and left lung, and signs of anal penetration. Her hands were cuffed behind her back, a sock had been stuffed into her mouth, and a gag was around her head to keep it in place.

On February 1, Crawford was interviewed for a second time by FBI agents and state highway patrol officers. He received Miranda warnings and executed a written waiver of his rights. He then described additional events leading up to Ray's murder, including the following:

> He had gone to the Hopper Barn, where he had been stockpiling food and drinks for about a month, on the day of Kristy's disappearance to think about things related to an "upcoming event" about which he was worried. . . . After considering and discounting the idea of running away or committing suicide, [Crawford] stated he went for a walk and ended up in an unfamiliar area. . . . [H]e suffered a blackout shortly thereafter, and when he came back to himself, he was standing in the Ray family's kitchen and could hear sobbing coming from a back bedroom.
>
> Upon entering the bedroom, he saw Kristy handcuffed on the floor, and he pulled a toboggan over his face so that she would not later be able to identify him. [Crawford] stated he was confused and did not know what had happened, so he forced Kristy into her car and they left the Ray home. [He] denied leaving or ever seeing the ransom note that was left at the Ray home. . . .
>
> [H]e and Kristy spent the night in the Hopper Barn. . . . At daylight, [Crawford] fled . . . into the woods with Kristy following him. [He] stated Kristy followed him without force, but that she was trying to convince him to turn himself in to police. . . .
>
> [Crawford] stated he had another blackout, and he awoke on a stump in the woods, clothed in an insulated t-shirt and a pair of blue jeans. . . . Kristy was lying at his feet with her hands handcuffed behind her back, and he knew she was dead. . . . [O]ne of his socks was in her mouth, and she was fully clothed, except that she had on no shoes. [Crawford] drug her by her feet to an area where he could hide her body, and . . . her pants and

underwear slid down as he drug her. [He then] covered Kristy's body with brush to hide it.

On February 1, a general affidavit and an arrest warrant were issued, formally charging Crawford with the crime of capital murder. On that same day, Fortier filed a motion to withdraw as Crawford's counsel, stating that a conflict of interest had arisen once he assisted police in arresting Crawford, and that he had "searched the depths of his soul, and [found] no way that he [could] set aside his prejudiced feelings now existing towards the Defendant in order to capably and properly represent the Defendant to the best of his ability."

Later that day Fortier met with the trial judge and the district attorney to discuss whether Crawford would submit to a psychiatric examination on his sanity and competency to stand trial with respect to the aggravated assault and rape charges. Fortier agreed to the examination without discussing it with Crawford, who was not present at the hearing. Fortier approved and signed the order as "Attorney for Defendant." He was later granted leave to withdraw on February 4, and James Pannell was substituted as defense counsel for the aggravated assault and rape charges, as well as the capital murder charge.

On February 2 Crawford was evaluated by psychiatric personnel at the Mississippi State Hospital (including Drs. Lott and McMichael). Crawford was later tried on the assault and rape charges, found guilty over his proffered defense of insanity, and sentenced to 66 years in prison.

Crawford was also charged in a four-count indictment for burglary of an inhabited dwelling, rape, sexual battery, and capital murder of Kristy Ray. At the capital murder trial, which began in April 1994, he once again presented an insanity defense, which included expert testimony from Dr. Stanley Russell, a psychiatrist with the Mississippi Department of Corrections. Dr. Russell had served as Crawford's treating physician at the correctional institution over the course of the previous 10 months.

At trial, Dr. Russell stated that Crawford suffered from occasional instances of psychogenic amnesia, a dissociative disorder characterized by long periods of time for which the sufferer has no memory. However, he admitted that there was no way to test for that diagnosis.[1] He reported that Crawford had been diagnosed as bipolar (also known as manic depressive) on previous occasions, but he did not agree with that diagnosis and had "never seen anything in my involvement with Charles . . . to suggest a manic episode." He also acknowledged that Crawford had "internalized a terrific amount of resentment, anger, and even . . . rage that became a part of him even from an early age," which manifested itself in, among other things, fights and substance abuse problems. He reported that Crawford's condition had not improved since early childhood and, if anything, Crawford had become more violent as time went on.

Dr. Russell ultimately concluded that Crawford lacked criminal responsibility for his actions at the time of the crime because Crawford experienced "defects of reason" during his episodes of psychogenic amnesia, and was not aware of the nature and consequences of his behavior. He did not dispute that Crawford remained a danger to society. Crawford's family members also testified that Crawford had suffered from mental illness almost all of his life, that he had a history of violence, and that he was a danger to the community.

The State called Dr. Lott who, by the time of the capital murder trial, had evaluated Crawford on four separate occasions in connection with the rape, assault, and capital murder charges. Dr. Lott concluded that Crawford did not suffer from either psychogenic amnesia or bipolar disorder, and that Crawford's loss of memory was a selective defect that appeared only when an offense was taking place. Dr. Lott stated that Crawford's behavior prior to the offense

---

[1] He reported that he confirmed this diagnosis by (1) speaking with an attorney, and (2) speaking with an expert who had developed a partial test for the disorder, although Dr. Russell had not administered that test to Crawford.

suggested premeditation and awareness, and that he suffered from antisocial, violent, aggressive, and potentially sexually predatory behavior. The State also called Dr. McMichael, the director of the forensic services unit at Mississippi State Hospital at Whitfield, who agreed that Crawford was feigning the symptoms of psychogenic amnesia and that Crawford's behavior prior to and following the crime demonstrated that he knew his behavior was wrong. The jury found Crawford guilty on all four counts.

The parties presented similar evidence at the sentencing phase. Dr. Russell testified that Crawford was operating under extreme emotional disturbance at the time of the crime, and again testified that he lacked criminal responsibility. The defense also called Dr. Martin Webb, a psychiatrist in private practice, who testified that Crawford suffered from bipolar disorder and that he lacked criminal responsibility as a result. Dr. McMichael testified that the records from the time of the offense did not describe someone in a manic episode, and that he suffered from no mental illness that would reduce his responsibility for the crimes committed.

The jury returned a sentence of death on the capital murder conviction, finding that: (1) Crawford was previously convicted of a felony involving the use or threat of violence; (2) the offense was committed during the crime of kidnapping; and (3) the offense was especially heinous, atrocious, or cruel. The jury also found that Crawford actually killed, attempted to kill, intended to kill, and contemplated that lethal force would be employed in committing the offense.

The conviction and death sentence were affirmed on direct appeal by the Mississippi Supreme Court on March 12, 1998. *Crawford v. State*, 716 So. 2d 1028 (Miss.), *cert. denied*, 525 U.S. 1021 (1998). That court denied Crawford's petition for post-conviction relief on December 4, 2003. *Crawford v. State*, 867 So. 2d 196 (Miss. 2003), *cert. denied*, 543 U.S. 866 (2004). He filed an application for a writ of habeas corpus under 28 U.S.C. § 2254 in the Northern District of Mississippi on September 27, 2004. The district court denied his application on

September 25, 2008, *Crawford v. Epps*, No. 3:04-cv-00059, 2008 WL 4419347 (N.D. Miss. Sept. 25, 2008), and denied Crawford a COA on November 25, 2008, *Crawford v. Epps*, No. 3:04-cv-00059, 2008 WL 5095993 (N.D. Miss. Nov. 25, 2008).

This court granted Crawford a COA on December 2, 2009 with respect to his claim that he was subject to a psychiatric evaluation on February 2, 1993 without the benefit of counsel in violation of the Sixth Amendment. *Crawford v. Epps*, 353 F. App'x 977, 994 (5th Cir. 2009). This court vacated the district court's order as it applied to that claim and remanded to the district court for an opportunity to develop the record and to reconsider the merits of Crawford's Sixth Amendment argument. Crawford's motion for a COA was denied in all other respects. *Id.*

On remand, the district court entertained additional briefing and allowed the parties to supplement the record with evidence regarding the Sixth Amendment issue. After considering the evidence, it concluded that Crawford's Sixth Amendment right had been violated, but that the constitutional error was harmless. *Crawford v. Epps*, No. 3:04-cv-00059, 2012 WL 3777024 (N.D. Miss. Aug. 29, 2012). The district court denied and dismissed his petition, but granted Crawford a COA on his Sixth Amendment claim.[2] Crawford timely appealed to this court.

## STANDARD OF REVIEW

Federal habeas relief is available when a state court decision adjudicating a claim on its merits is shown to be either: (1) "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable

---

[2] The State, in its brief, maintains that "[t]he case at bar is a motion for COA after the denial of habeas relief and subsequent denial of COA by the United States District Court for the Northern District of Mississippi." Red Br. at 1. This is a misrepresentation of the procedural posture of this case. We hope that this was an accidental error, but warn that such misstatements are not taken lightly by this court.

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The merits of Crawford's Sixth Amendment claim were considered for the first time during state post-conviction review. *See Crawford*, 867 So. 2d at 204-205 ("Crawford now, for the first time, argues that his court ordered mental examination was an interrogation in violation of his right to counsel. Due to the heightened scrutiny given to death penalty cases, we will still examine Crawford's argument that the confessions emanating from the mental examination should have been suppressed."). In those proceedings, the Mississippi Supreme Court interpreted Crawford's Sixth Amendment claim as arguing that he was not given the opportunity to "confer with counsel" prior to or during the psychological examination. *Id.* at 205. It did not understand Crawford to argue that "there either was no counsel at the time of the examination or counsel was given no notice of the examination." *Id.* Finding the right to confer with counsel alone not cognizable under the Sixth Amendment, it denied the claim.

The Mississippi Supreme Court's reading of Crawford's argument was in error. As the district court acknowledged, Crawford alleged in his post-conviction petition that: (1) Fortier extended the scope of his representation when he signed off on the February evaluation order, and (2) Crawford was entitled to the assistance of counsel because the evaluation represented a "critical stage" of the capital murder prosecution. We agree with the district court that the Mississippi Supreme Court's evaluation of Crawford's claim "disregarded the aspect of Petitioner's claim that asserted a right to the appointment of counsel due to the separate murder charge, and that the court failed to adjudicate the claim as presented." *Crawford*, 2012 WL 3777024, at *5. Therefore, the deferential standard of review reserved for habeas claims is not applicable. *See Gonzalez v. Thaler*, 643 F.3d 425, 429-30 (5th Cir. 2011); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009). On appeal, "[w]e review the district

court's findings of fact for clear error and its conclusions of law *de novo*." *Gonzalez*, 643 F.3d at 429.

## DISCUSSION

The Sixth Amendment right to counsel attaches when "a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001). On February 1, the day before the psychiatric examination, a general affidavit and an arrest warrant were issued, formally charging Crawford with the crime of capital murder. Crawford's Sixth Amendment right with respect to the murder charge attached at that time. *Id.*; *see Wilcher v. Hargett*, 978 F.2d 872, 876 (5th Cir. 1992). The issue on appeal is whether conducting the February 2 evaluation violated Crawford's Sixth Amendment rights.

a.    *Constitutional violation*

As this court has previously recognized, there is no Sixth Amendment right to have an attorney present during a psychiatric evaluation. *See Estelle v. Smith*, 451 U.S. 454, 470 n.14 (1981); *United States v. Byers*, 740 F.2d 1104, 1119 & n.16 (D.C. Cir. 1984); *accord Crawford*, 353 F. App'x at 982. However, Crawford had a right to counsel's assistance "in making the significant decision of whether to submit to the [psychiatric] examination and to what end the psychiatrist's findings could be employed." *Estelle*, 451 U.S. at 471. Defense counsel must have been given prior notification of the nature and scope of the examination, and an opportunity to consult with the defendant about the uses to which the examination could have been put. *Id.*; *see Gholson v. Estelle*, 675 F.2d 734, 743 (5th Cir. 1982).

The Third Circuit has explained the doctrine as follows:

Before submitting to [a compelled psychiatric interview], the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified. The warnings must advise the defendant of the "consequences of foregoing" his right to

remain silent . . . [T]he Fifth—but not Sixth—Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings. . . . [However,] the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes.

*Gibbs v. Frank*, 387 F.3d 268, 274 (3d Cir. 2004) (footnote and citations omitted).

At the time that Fortier approved the examination, he was acting as counsel to Crawford in his aggravated assault and rape trial. Crawford was advised of his Miranda rights by the examining physicians, and he planned to initiate a trial defense of mental incapacity or disturbance. "[T]he use of the evaluation during *that* trial would not have offended Crawford's Fifth or Sixth Amendment rights." *Crawford*, 353 F. App'x at 982 (emphasis added).

But the Sixth Amendment is offense specific, *see Cobb*, 532 U.S. at 168, and is not waived merely because (as Crawford did in this case) the defendant employs a defense of mental incapacity. *Gibbs*, 387 F.3d at 274 (citing *Buchanan v. Kentucky*, 483 U.S. 402 (1987) and *Powell v. Texas*, 492 U.S. 680 (1989)). And although "the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events," *id.* at 274, "Crawford had already committed the Ray murder and intended to present an insanity defense in the assault trial. It was therefore foreseeable that his mental state could be placed at issue during any ensuing capital murder trial." *Crawford*, 353 F. App'x at 983. As we stated previously, although "Fortier's approval likely satisfied any Sixth Amendment concerns in the rape and assault case . . . whether it afforded Crawford adequate protection in the murder case is a distinct inquiry that should be treated separately." *Id.* at 983-84.

The district court conducted extensive discovery on this issue pursuant to this court's direction. It concluded that Crawford was never given an opportunity to communicate with his counsel prior to the February 2 evaluation and that Fortier was conflicted and never retained to represent him with respect

to the capital murder charge. The court held that the February 2 psychiatric evaluation was conducted in violation of Crawford's Sixth Amendment right to counsel with respect to the capital murder charge.

We agree. The district court's additional review of the facts makes clear that, as this court initially suspected, Crawford had no counsel in the murder case at the time of either the district court order or the examination. *See Crawford*, 353 F. App'x at 983 (granting a COA with respect to the potential Sixth Amendment violation because the record reflected that Crawford "had no legal counsel to advise him about whether to submit to the examination, which could have prejudiced . . . his murder defense."). Because Fortier was not retained to represent Crawford in the capital murder charge and, in any event, had filed a motion to withdraw altogether, there was no counsel who could be "notified in advance" about the scope of the examination, and no counsel to assist Crawford "in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." *Estelle*, 451 U.S. at 471. The State does not contest this point on appeal. We hold that Crawford was required to undergo a psychiatric examination on February 2 "without 'the guiding hand of counsel,'" in violation of his Sixth Amendment rights. *Id.* (quoting *Powell v. Alabama*, 287 U.S. 45, 69 (1932)).

We also agree with the district court that Crawford did not waive his Sixth Amendment right to counsel by cooperating in police questioning on February 1 and 2. To show waiver, the State must prove "'an intentional relinquishment or abandonment of a known right or privilege.'" *Brewer v. Williams*, 430 U.S. 387, 404 (1977) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). We are obligated to "indulge in every reasonable presumption against waiver." *Id.*

The Sixth Amendment right as it applies to psychiatric evaluations requires the State to provide defense counsel with notice of the evaluation. *Estelle*, 451 U.S. at 471; *Satterwhite v. Texas*, 486 U.S. 249, 255-56 (1988). Crawford was not present at the meeting at which the psychiatric evaluation

was ordered, and therefore could not knowingly waive his right to notification of counsel.  *See Hernandez v. Johnson*, 248 F.3d 344, 366-67 (5th Cir. 2001) ("[T]he Sixth Amendment right to counsel, once it has attached, unlike the Fifth Amendment Miranda right, cannot be waived by a capital defendant acting on his own without the guidance of counsel.").  Furthermore, given the presumption against waiver of a Sixth Amendment right, we do not find that Crawford's waiver of his Miranda rights and cooperation in police questioning alone amounted to a knowing and voluntary waiver of his Sixth Amendment right to counsel with respect to his psychiatric evaluation.  *Id.*; *see also Vanderbilt v. Collins*, 994 F.2d 189, 197 (5th Cir. 1993) ("The application of Miranda in the setting of a psychiatric examination is quite different from its application in an ordinary police interrogation."); *accord Powell*, 492 U.S. at 683-86.  We therefore uphold the district court's ruling that there was constitutional error in the February 2 evaluation.[3]

b.    *Harmless error*

This court will not overturn a state court conviction on habeas review unless the alleged constitutional error had a "substantial and injurious influence or effect" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Satterwhite*, 486 U.S. at 257 (holding that when the prejudice from a Sixth Amendment violation is "limited to the admission into evidence of [the mental health] testimony," harmless error analysis applies); *Woods v. Johnson*, 75 F.3d

---

[3]    To the extent that the Mississippi Supreme Court held that the facts and briefing, as it read them, did not amount to a constitutional violation, we also hold that this decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *see also Carty*, 583 F.3d at 253 ("We review under AEDPA's heightened standard the portion of Carty's claim . . . that the [the state court] adjudicated on the merits; the rest of her claims . . . we review de novo.").

1017, 1030 (5th Cir. 1996); *Vanderbilt*, 994 F.2d at 198-99.[4]  This is a "less onerous" standard than the traditional test of "'harmless beyond a reasonable doubt,'" and "promotes the considerations underlying our habeas jurisprudence." *Brecht*, 507 U.S. at 622, 623 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).  In this circuit, "a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is *more* than a mere reasonable possibility that it contributed to the verdict.  It must have had a *substantial* effect or influence in determining the verdict."   *Woods*, 75 F.3d at 1026.  Although it is the accused's opportunity to consult with counsel, and not the subsequent use of the evaluation, that is the concern of the Sixth Amendment, *see, e.g. Powell*, 492 U.S. at 685 & n.3*; Buchanan*, 483 U.S. at 424-25, the use of the evaluation is relevant to a harmless error analysis on collateral review. *Satterwhite*, 486 U.S. at 257-60; *Woods*, 75 F.3d at 1026-1033.

We agree with the district court that, taking all of the facts into account, the Sixth Amendment violation that occurred as a result of the February 2 evaluation did not have a "substantial and injurious influence or effect" on the verdict.  *See Brecht*, 507 U.S. at 623.  Drs. Lott and McMichael also examined Crawford in December 1992, and Dr. Lott conducted two additional examinations between the February 2 evaluation and Crawford's capital murder trial while Crawford was represented by counsel.  The clinical opinions reached as a result of the February interview were substantially similar to those reported in December 1992, and also conformed with the results of the latter two evaluations (which Dr. McMichael evaluated and reviewed prior to testifying). The doctors consistently found that Crawford was malingering his memory

---

[4]    The "mandate rule" requires implementation of "both the letter and the spirit of the appellate court's mandate."  *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (quoting *United States v. Becerra*, 155 F.3d 740, 752 (5th Cir. 1998)).  Because habeas relief may not issue unless there is both a constitutional error and, in this context, a substantial and injurious effect on the verdict, *Brecht*, 507 U.S. at 623, the district court was obligated to consider the latter on remand, and we are obligated to review it here.

defects, that his claims of incapacity were neither credible nor consistent with his actions at the time of the crime, and that he was a dangerous individual with a history of aggressive behavior.

In addition to those examinations, Drs. Lott and McMichael reviewed FBI interviews conducted with Crawford as well as his mental health records, including records from physicians at the East Mississippi State Hospital. The records consistently demonstrated that Crawford was malingering the symptoms of psychogenic amnesia, had a history of feigning mental health problems, including a faked suicide attempt, and had a history of aggression and repeated violent action toward women.

Drs. Lott and McMichael also supported their conclusions by analyzing the testimony of the lay witnesses and Dr. Russell. They concluded that the lay witness reports did not demonstrate a mental illness, and noted that Dr. Russell reached his conclusion without reviewing Crawford's previous medical history. The two doctors agreed with Dr. Russell's testimony in some respects—namely, that Crawford was not bipolar, did not suffer from manic episodes, and that his personality reflected a significant amount of resentment, anger, and rage which manifested in violent episodes. But they disagreed with the diagnosis of psychogenic amnesia given Crawford's extensive preparations for the event and the selective manner in which he reported his own loss of memory.

Dr. Russell's testimony that Crawford suffered from psychogenic amnesia, moreover, was discredited through cross examination. Dr. Russell was shown to be unaware that: (1) one of Crawford's socks was found in Ray's mouth; (2) Crawford handcuffed Ray to a tree; (3) Crawford covered Ray's body after she was dead; and (4) Crawford concealed his clothing after the event. Dr. Russell also admitted that he did not know that Crawford had worn a ski mask during the incident so that Ray would not recognize him, and that had he known that information, it would have mitigated against his diagnosis and would "indicate that [Crawford] had some awareness of what he was doing." Dr. Russell

14

ultimately concluded that he had no way of knowing whether the information upon which he formed his diagnosis was complete.

Dr. McMichael also noted that psychogenic amnesia is a rare diagnosis that individuals in clinical practice rarely encounter, and that when it does occur, it usually happens only once, after which a patient completely recovers. More importantly, however, both Dr. Lott and Dr. McMichael clarified that psychogenic amnesia only means that a patient has no memory of an event. It does not mean that the patient has no control during the event. Even if Crawford suffered from psychogenic amnesia, which they contested, it would not have impacted his ability to know right from wrong during the commission of the crime.

During the sentencing phase of the trial, Crawford's defense counsel presented similar testimony from Dr. Russell, as well as testimony from Dr. Webb, who evaluated Crawford for ten days in April of 1993 at the request of Crawford's family. Dr. Webb concluded that Crawford had a manic depressive illness and was suffering from symptoms of mania at the time he committed the crime. As a result, Dr. Webb's expert opinion was that Crawford committed this offense while under the influence of extreme mental disturbance, that Crawford admitted to this crime under extreme duress, and that Crawford's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was substantially impaired at the time of the commission of this crime. Dr. Webb did concede that, if given a longer period of time in which to examine Crawford, he could have come to a firmer conclusion.

Dr. Webb's diagnosis contradicted not only that of Dr. Russell, but also that of Drs. Lott and McMichael, who all concluded that Crawford was neither manic nor exhibited any evidence of manic episodes. Dr. Webb refused to dispute Dr. Russell's diagnosis of psychogenic amnesia but, as Dr. McMichael explained, Crawford could not have simultaneously exhibited both psychogenic amnesia and mania.

Two other considerations impact our harmless error analysis. First, Crawford was represented by counsel during the evaluations except the one that occurred on February 2. In addition to demonstrating that the State had sufficient evidence to convict Crawford, these evaluations suggest that Crawford would have likely consented to the February 2 evaluation if he had adequate representation at that time. Thus, to the extent that Crawford argues that our harmless error analysis should focus on the impact of the deprivation of counsel—and not the effect on the trial—that argument is without merit.

Second, since Crawford was presented with the testimony of Drs. Lott and McMichael during his trial for aggravated assault and rape, he could anticipate the testimony that would be introduced were he to raise an insanity defense during his capital murder trial. In choosing to pursue his insanity defense, Crawford "made the 'significant decision' regarding the psychiatric evaluation, and cannot now complain that he was denied the effective assistance of counsel prior to the examination because he was unable to consult with his attorney as to whether to submit to a psychiatric examination." *Vardas v. Estelle*, 715 F.2d 206, 211 (5th Cir. 1983); *see Rivera v. Collins*, 934 F.2d 658, 661-62 (5th Cir. 1991) ("Once [the defendant] raised an insanity defense, the state had the right to require that [he] be examined by a state psychiatrist outside the presence of his counsel. . . . The relevant consultation between [the defendant] and [his counsel] thus occurred at the time that [the defendant] decided to raise the defense.").

In conclusion, there was an abundance of evidence, independent from the results of the February 2 evaluation, upon which the jury could base its decisions that Crawford was criminally responsible for his actions, and that the death penalty was merited. Crawford was aware of this evidence, and chose to pursue his insanity defense knowing it would be introduced. Against this backdrop we cannot say that the February 2 evaluation, standing alone, had "a *substantial* effect or influence in determining the verdict," or that there was "*more* than a

mere reasonable possibility that it contributed to the verdict." *Woods*, 75 F.3d at 1026. We conclude that the error was harmless, and Crawford is not entitled to habeas relief.

We must respond to two additional points raised by Crawford. Crawford argues, and the State concedes, that the district court erred in its analysis when it held that the State did not bear the burden of proof on the introduction of psychiatric testimony. It is true that in Mississippi, once the defendant raises a reasonable doubt as to his sanity, "the State bears the burden to prove [the defendant's] sanity beyond a reasonable doubt." *Roundtree v. State*, 568 So.2d 1173, 1181 (Miss. 1990). But while we credit Crawford's argument, this is a distinction without a difference. *Satterwhite* holds that harmless error analysis may apply even when the State has the burden to show a relevant mental state. *See Satterwhite*, 486 U.S. at 256-58. Although this burden is a heavy one, this court must still consider whether the introduction of the psychiatric examination had a "substantial and injurious effect" on the State's ability to carry that burden. *Woods*, 74 F.3d at 1027; *see id.* at 1027-1033 (holding that the introduction of a psychiatric examination was harmless even though the state bore the burden of establishing future dangerousness); *see also Satterwhite*, 486 U.S. at 258 (applying an earlier, elevated standard for harmless error analysis). For the reasons stated above, we hold that it did not.

Crawford also maintains that Fortier's alleged conflict requires automatic reversal under *Holloway v. Arkansas*, 435 U.S. 475 (1978), *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and *United States v. Cronic*, 466 U.S. 648, 658 (1984). This argument is incorrect. Crawford's Sixth Amendment violation was "limited to the admission into evidence" of certain medical testimony, *Satterwhite*, 486 U.S. at 257, and not one "in which the deprivation of the right to counsel affected—and contaminated—the entire criminal proceeding." *Id.* This case falls squarely within the scope of *Satterwhite*, and is subject to a harmless error analysis. *Id.* at 256-57 (distinguishing *Holloway*, 435 U.S. 475).

No. 12-70027

## CONCLUSION

Crawford was deprived of his Sixth Amendment right to counsel with respect to his capital murder charge as a result of the February 2 psychiatric evaluation. However, we recognize that the State would have presented sufficient evidence to the jury to uphold Crawford's conviction and sentence even if the February 2 evaluation had not occurred. Accordingly, the constitutional error was harmless and Crawford is not entitled to post-conviction relief. The decision of the district court is AFFIRMED.