PIERCE, Justice,
for the Court:
¶ 1. Charles Ray Crawford appeals from his 1993 conviction for rape, raising numerous assignments of error. The record is unclear as to what caused the delay in this case being heard on appeal. For this reason, we decided to set aside the procedural bar in this matter and consider the merits of Crawford’s claimed errors. Having carefully reviewed this record,'we have concluded that there is no merit, in any of Crawford’s assignments of error. ..Only four issues warrant discussion:
I. WHETHER THE TWENTY-ONE-YEAR DELAY IN THIS APPEAL VIOLATES CRAWFORD’S DUE PROCESS RIGHTS UNDER THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS.
II. WHETHER CRAWFORD WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN HE WAS CONSTRUCTIVELY LEFT WITHOUT COUNSEL DURING A CRITICAL STAGE OF THE PROCEEDINGS AGAINST HIM.
III. WHETHER THE TRIAL COURT COMMITTED RE *907 VERSIBLE ERROR WHEN, OYER CRAWFORD’S OBJECTION, IT GAVE A JURY INSTRUCTION THAT IMPROPERLY SHIFTED THE BURDEN OF PROOF IN VIOLATION OF CRAWFORD’S CONSTITUTIONAL RIGHTS.
IV. WHETHER CRAWFORD’S CONSTITUTIONAL RIGHTS WERE VIOLATED BY A SEARCH OF HIS HOME BY LAW-ENFORCEMENT OFFICIALS WITHOUT A WARRANT.
FACTS AND PROCEDURAL HISTORY
¶2. On April 13, 1991, seventeen-year-old Sue[1] was riding around Walnut, Mississippi, with her friend Nicole. The girls were in Nicole’s grandfather’s car. The girls had been told to put fluid in the car and had purchased what was needed. They saw Charles Ray Crawford in the Twin Oaks parking lot and went over to ask if he would help them put fluid in the car. Crawford had his young son with him at the time. Crawford agreed to help and told the girls to drive over to the ballpark. They did, and Crawford met them there. While. putting fluid in the car, Crawford told Sue that he needed to talk to her about something but refused to say what it was about.
¶ 3. Later that evening, as the girls continued to drive around, they spotted Crawford. They flashed their lights to pull him over. Sue asked Crawford what he wanted to talk to her about. Cretwford told her they needed to get out of Walnut to talk because his ex-wife Gail might find out he was talking to her and stop him from seeing his son.[2] Crawford told them to meet him at Chalybeate Cemetery. ■ >
¶4. After finding Crawford parked at the cemetery, the girls pulled up their car beside his truck and rolled down the window. Crawford, who no longer had his son with him, told Sue to get in the truck so they could talk; < Sue did and Crawford told her that her boyfriend'had pictures of Sue that were “pretty ’bad.” ' - Crawford also told her that he had< gotten the pictures from her boyfriend and planned to get rid of them. Sue told Crawford she wanted the pictures. Crawford replied that the pictures were at his house and she should tell Nicole they, needed to ride to his house. Sue and Nicole then got in Crawford’s truck, and he .drove them to his house. '
¶ 5. As they drove by the school, Crawford asked the girls to “scrunch down” in the truck so no une would see them. Crawford then parked by a nearby abandoned house instead of parking at his house. When they parked, Crawford told Nicole to stay in the car and told Sue to walk with him to his house. When Sue and Crawford got inside the back door of the house, - Crawford stopped and told Sue to stay there so he could make sure nobody was home. Sue saw him walking through the house. When Crawford returned, he pulled a gun and put it to Sue’s head.
¶ 6. Crawford told her to .do what he said and not to yell and no one would get hurt. He told Sue to get on the floor. As she did, she asked why he. was doing this. Crawford told her to shut up. He taped *908 her mouth shut with duct tape. He then told her to put her hands behind her back. When she did, Crawford taped her hands together.
¶ 7. Crawford pulled Sue up and led her through the kitchen into a bedroom. Crawford lay Sue on the bed and began removing her shoes. Sue loosened the tape on her mouth by licking it with her tongue so she could speak. Sue told Crawford he could not touch her because she was on her period. Crawford told her he would take care of it. Crawford pulled her pants and panties off then removed her tampon. He then engaged in sexual intercourse with her.
¶ 8. Afterwards, Sue asked Crawford not to hurt Nicole." Crawford told her not to move and went outside. Sue heard a noise then heard Crawford come back inside the house. Crawford ran into the bedroom and said somebody was there. Crawford grabbed Sue up and they ran out of the house. As they ran out, Crawford said, “What have I done? We’ve got to get out of here. Somebody is here.”
¶ 9. When they got back to the truck, Sue did not see Nicole, but she did see a hammer. Sue asked Crawford where Nicole was and Crawford responded that he had hit Nicole and she had run away. Crawford then looked at Sue and said, “What have I done? Janet is going to hate me.” Sue responded by saying “please don’t hurt me.”
¶ 10. Crawford and Sue walked back toward Crawford’s house, and he untaped her. Sue was able to pull her clothes back on as they got back to the house. Crawford then handed Sue the gun and told her to shoot him. Sue told him that she could not do it. Crawford then said that he needed to see Janet. Crawford asked her to go to Memphis, Tennessee with him to see Janet. Sue agreed to go because she was worried he might hurt her or her sister if she did not.
1Í11. Sue and Crawford got back in Crawford’s truck and began driving on back roads toward Memphis. On the way, they stopped at Barry King’s house and Crawford asked to borrow his car because he knew the law would be looking for him. King refused but told Crawford to go ask Jackie Brooks if he could borrow his vehicle. Crawford and Sue drove to Brooks’s house and Crawford asked Jackie to borrow his truck because he was running from the law. Brooks refused to allow him to borrow his truck but did agree to drive him to Memphis. Brooks told Crawford to park his truck behind his house. Brooks and his wife then drove Crawford and Sue to Memphis. There, they dropped Crawford and Sue off at Timmy Joiner’s house and returned home.
¶ 12. Joiner, a friend of Crawford’s, drove Crawford and Sue to a nearby Budget Inn and secured a room for them. Joiner left the two of them in the room and went back to his house. Crawford asked Sue if she was scared. When she said she was, Crawford responded that she should not be. Sue asked to talk to Janet, and Crawford began crying and saying he was sorry. Crawford slept on the foot of Sue’s bed holding her foot so she could not get away.
¶ 13. The next day, Joiner picked up Crawford and Sue and they drove to a few different convenience stores where Crawford tried to use the phone. Crawford finally told Joiner to pull over somewhere so he could think. They pulled down a little road and stopped. Crawford began saying he was going to Mil himself. Joiner calmed him down, and Crawford told Joiner to take Sue to call Janet.
¶ 14. Joiner and Sue then left Crawford where he was and drove to a pay phone. Sue talked to Janet and told her that *909 Crawford had raped her. Janet asked to speak to Joiner again. When Joiner got off the phone with Janet, he said that he did not understand what was going on but that Janet had told him to tell Crawford to turn himself in to the police. Sue cried as they drove back to where they left Crawford, and Joiner told Crawford that Janet said he should turn himself in to the police.
¶ 15. Joiner then drove Crawford to a convenience store where Crawford dialed 911 and turned himself in to' police. Joiner drove Sue to meet Janet. Sue was taken to a local hospital, and a rape kit and hair samples were taken.
¶ 16. Meanwhile, Deputy Greg Hopper, Chief Deputy Tommy Story, and other officers from the Tippah County Sheriff’s Department responded to a call that someone had been hit in the head. They arrived at Crawford’s grandparents’ house and found Nicole lying on a stretcher. Nicole told the officers that Sue needed help and that she was at Crawford’s house.
¶ 17. The deputies then went to Crawford’s house. They knocked and yelled, but no one answered the door. Deputies found no one inside the house but did find a used tampon in the bedroom, a-roll of duct tape with hair on the kitchen table, and a strip of duct tape with hair inside the house. The back door was open and the deputies saw blood on the stairs. They also saw footprints in the garden and followed them to a nearby abandoned house. Outside they found more duct tape with hah*. Relatives gave the deputies a description of Crawford’s truck and an all points bulletin (APB) was sent out.
¶ 18. Later, deputies located Crawford’s truck behind Brooks’s residence. The Memphis Police Department recovered a .22 caliber R & G revolver and apprehended Crawford. The hair found on the roll of duct tape and various pieces of duct tape found in and outside of Crawford’s residence were compared with known samples of Sue’s hair and Crawford’s hair. Some hair on the tape matched Sue’s known hair samples ■ and some matched Crawford’s known hair samples.
¶ 19. Crawford was indicted by the Tip-pah County Grand Jury for the kidnap and rape of Sue (cause number 5780) — the case now before us. Crawford also was separately indicted for aggravated assault of Nicole (cause number 5779). Both cases eventually were tried separately in Chickasaw County, after the trial court granted Crawford’s motion for a change of venue.
¶ 20. Prior to both trials, Crawford indicated that he planned to pursue an insanity defense. Crawford was thereafter evaluated and examined by multiple mental-health professionals.
¶ 21. On January 30, 1993, three days before the trial for the aggravated-assault charge was set to .begin, Crawford was arrested for the murder of Kristy D. Ray while engaged in the crime of kidnapping, burglary of an occupied dwelling, rape, and sexual battery. The crimes occurred on January 29, 1993. Crawford ultimately was convicted of capital murder and sentenced to death. See Crawford v. State, 716 So.2d 1028 (Miss.1998).'
¶22. On February 1, 1993, during a pretrial hearing the morning before the aggravated-assault case was set to start, the State moved for a competency evaluation under then Uniform Rule of Circuit and County Court 4.08. William Fortier, Crawford’s trial counsel at the time for both the aggravated-assault case and the instant case, responded to the motion, stating:
Your Honor, we have consented to the motion by- the State for a psychiatric evaluation to determine whether or not Mr. Crawford is able to stand trial at *910 this time, • I think there is a serious question as to his: ability- to stand trial on these charges based on the acts that have= come to light over the weekend; and, therefore, we agreed with the motion; and we have approved the order submitted to the court for the psychiatric evaluation,
¶ 23. The trial court responded, noting first for the record that;it previously had ordered that Crawford be examined at the Mississippi State Hospital at Whitfield to determine his mental ability to stand trial. A report was issued by the State Hospital on December 23, 1992, concerning Crawford’s mental health. Doctors there had concluded, based on psychiatric examinations they had conducted on Crawford, that Crawford was legally competent to stand trial. The trial court then ordered another psychiatric evaluation be conducted, finding that, based on the present circumstances, reasonable grounds existed to believe that Crawford might be incompetent to stand trial. The court noted for the record that it was ordering the psychiatric evaluation on the court’s own motion.
¶ 24. That same day, Fortier submitted a motion to withdraw as counsel. The trial court stayed the motion and continued all other motions and the scheduled aggravated-assault trial until another psychiatric examination of Crawford was conducted. Three days later, -the trial court granted Fortier’s motion to withdraw, and James Pannell was appointed as Crawford’s counsel.
¶ 25. Meanwhile, Crawford was evaluated at the Mississippi State Hospital on February 2, 1993, by Dr. Reb McMiehael and Dr. Criss Lott. A competency hearing was held on February 11, 1993, to determine Crawford’s competence to stand trial in both cases. The record indicates that, prior to the hearing, both doctors briefly evaluated Crawford at the courthouse and that Panned was present during the interview(s). During the hearing, Panned cross-examined both doctors as to Crawford’s competency to stand trial. Panned also questioned both doctors about what medical signs he (Panned) should be aware of while representing and preparing Crawford for trial that might indicate to him (Panned) that Crawford is “slipping out of competency.” Following the hearing, the trial court issued an order finding Crawford competent to stand trial.
¶26. Crawford stood trial for the aggravated-assault charge on May 18, 1993. The rape and kidnapping charge was brought to trial on August 3,1993.
¶27. Prior to the aggravated-assault trial, a motion was entered on March 16, 1993, for' further psychiatric evaluation of Crawford; the record does not disclose who requésted the evaluation. In May 1993, Crawford through his counsel Panned, submitted a motion for a competency evaluation in the aggravátfed-assault case. On the day-the aggravated-assault'trial began, a pretrial competency hearing was conducted, after which the trial court found Crawford competent -to stand trial. Crawford was found guilty of aggravated assault in that proceeding and was sentenced to twenty years in the custody of the Mississippi Department of Corrections. No post-trial motions were filed at that time, and no appeal was taken. See Crawford v. State, 787 So.2d 1236, 1238 (Miss. 2001). On March lit, 1996, Crawford filed a pro se motion for appointment of counsel, but he did not pursue that motion. Id. In 1998, David Bed (who was appointed co-counsel with Panned in Crawford’s capital-murder case) filed, on behalf of Crawford, a motion for judgment notwithstanding the verdict (JNOV), or, in the-alternative, for a new trial. Id. In the motion, Bed stated that Crawford had sought new counsel, and he (Bed) was appointed. Bed request *911 ed that the motion be considered nunc pro tunc. Id. The trial court found the motion for a new trial was not timely and was not properly before the circuit court. Id. The trial court, however, at Crawford’s request and over the State’s objection, considered the motion for JNOV or new trial as if it had been timely filed. Id. at 1239: After hearing arguments on the motion, the trial court found no grounds which warranted granting JNOV or a new trial and denied the motion. Id. Crawford then appealed to this Court, which affirmed Crawford’s conviction and sentence. Id at 1249.
¶ 28. Meanwhile, the instant case was brought to trial on August 3, 1993. At trial, Crawford called' his mother and ex-wife Gail Thompson to testify about spells of mental illness Crawford had experienced throughout his life and about Crawford’s stays in mental hospitals. Crawford also called Jackie Brooks and Brooks’s wife, Tammy. Both testified that when Crawford and Sue were with them in Brooks’s truck, they appeared to be boyfriend and girlfriend and that Sue never indicated she had been raped. Crawford also testified at trial. His testimony indicated that he had no memory of the incident. When asked if he raped Sue, Crawford responded:
I can’t honestly say that I didn’t, and I can’t sit here and tell you that I did. The only thing that I’ve got to go by is what she said. I’m not going to lie and say I didn’t, and I’m not going to turn around and lie and say that I did, because I don’t know.
The State then presented two rebuttal witnesses. Dr. Stanley Russell, who had been seeing Crawford in prison while awaiting trial, testified that his diagnosis of Crawford was adjustment disorder with depressed mood and a personality disorder. Both disorders, according to Dr. Russell, were psychiatric disorders and “do not deviate [Crawford’s] responsibility for behavior.” Dr. McMichael, who had evaluated Crawford twice- for the purpose of conducting a sanity evaluation of Crawford and determining Crawford’s competency to stand trial, also testified. Dr. McMichael testified that Crawford. was malingering or faking or exaggerating his memory loss. He also diagnosed Crawford with a personality disorder and noted Crawford’s past struggles with cocaine abuse, alcohol abuse, and marijuana abuse. Dr. McMichael testified that “none of these diagnoses- would rise to the level of something that would, cause [Crawford] truly not to know what he’s doing.”
¶29. On August 6, 1993, Crawford’s jury found him guilty of' rape and not guilty of kidnapping. The trial court sentenced Crawford to forty-six years in the custody of the Mississippi Department of Corrections for ' the rape conviction. Crawford’s trial counsel did not file any post-trial motions in the instant-case, nor did he file a notice of appeal.
¶ 30.' On September 23, 1993, Crawford was indicted .by the Tippah County Grand Jury for capital murder for the killing of Kristy D. Ray. As mentioned, Bell was appointed co-counsel'with Pannell in the capital-murder case. Venue changed in that case from Tippah County to the Circuit Court of Lafayette County, Mississippi. The capital-murder case went to trial on April 18, 1994. Crawford was found guilty on all counts, and Crawford was sentenced to death on April 23,1994. Bell, Crawford’s co-counsel in the capital-murder case, represented Crawford on appeal in that case. This Court affirmed Crawford’s capital-murder conviction and death sentence ■ on ■ appeal. See Crawford v. State, 716 So.2d at 1053, superseded on other grounds by Miss. Transp. Comm’n v. McLemore, 863 So.2d 31 (Miss.2003).
*912 ¶31. In April 1995, Crawford sent a letter to the Chickasaw County Circuit Clerk, asking when his notice of appeal was filed in the instant case. The circuit clerk responded that the record had been transferred to Tippah County, and that she had forwarded Crawford’s letter to the Tippah County Circuit Clerk. In January 1996, Crawford sent a letter to Judge Kenneth Coleman, who had presided over all three cases, asking for counsel to pursue an appeal. On March 27, 1996, Judge Coleman appointed Bell to pursue Crawford’s appeal in the instant case.
¶ 32. Bell requested the trial transcript in July 1996. In September 1998, Bell moved for JNOV or for a new trial, which Judge Coleman denied on October 13, 1998. Bell filed a notice of appeal on November 9,1998, and designated the record on November 25, 1998. Crawford was granted leave to proceed in forma pauperis November 30, 1998. The record is silent as to why the appeal was never docketed with this Court.
¶ 33. By an order entered February 2, 2002, Thomas Levidiotis was appointed by the trial court in place of Bell. Levidiotis made inquiry with this Court regarding the status of the appeal in this case, but the record does not reflect that anything else was done in furtherance of the appeal.
¶ 34. Crawford’s present appellate counsel made an entry of appearance on January 7, 2014.[3] Present counsel then filed an amended and corrected notice of appeal and an amended and corrected designation of record. The case was submitted for our review of the issues on March 23, 2015.
¶ 35. Additional facts, as necessary, will be related in our discussion.
I. THE TWENTY-ONE-YEAR DELAY IN THIS APPEAL VIOLATES CRAWFORD’S DUE-PROCESS RIGHTS UNDER THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS.
¶ 36. Crawford contends that the twenty-one-year delay for his appeal in this case to be heard has denied him due process of law. We disagree.
¶ 37. The record does not disclose why an appeal was not filed with this Court until now, which Crawford’s current appellate counsel acknowledges. Counsel asserts, however, that Crawford is not to blame. We do not know that to be the case from the record before us.
¶ 88. Neither the United States Supreme Court nor this Court has extended a criminal defendant’s constitutional right to a speedy trial to the appellate context. See Hayes v. Ayers, 632 F.3d 500, 523 (9th Cir.2011) (“No Supreme Court decision ‘squarely addresses’ the right to a speedy appeal, nor does the right to a speedy trial ‘clearly extend’ to the appellate context.”) (quoting Wright v. Van Patten, 552 U.S. 120, 123, 125, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008)); Kolberg v. State, 704 So.2d 1307, 1320 (Miss. 1997) (“The remedy for denial of a speedy appeal is not clear since this Court has never recognized such a right and does not do so now.”). In certain circumstances, due process concepts may become implicated when substantial delays during the criminal appellate process occur. Lanier v. State, 684 So.2d 93, 98 (Miss.1996). *913 This is rare, however. And we stress that, unlike in a criminal trial, where the State bears the responsibility of bringing a criminal defendant to trial,, the same burden does not lie with criminal appeals. As a matter of course, criminal defendants carry responsibility for submitting an appeal. And we are loathe to set aside time-limit requirements — fundamental in their own respect — in cases'where that responsibility is eschewed. Again, we do not know that to be the cáse here. Accordingly, we have decided to hear Crawford’s appeal. We remain adamant, though, that denial of a speedy appeal is not reversible error on its own in this state. Haynes v. State, 584 So.2d 432, 433 (Miss.1991). And where no other reversible error exists, reversal on the grounds of a denial of a speedy appeal is inappropriate. Lanier, 684 So.2d at 100 (citing Haynes, 584 So.2d at 433).
¶ 39. We find that to be the case here. As mentioned, we have thoroughly reviewed the record in this case and find no, merit in any of the ten assignments of error Crawford raises in this appeal. We find only four of these issues warrant discussion. Having addressed the previous issue, we now proceed to the remaining three.
II. WHETHER CRAWFORD WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN HE WAS CONSTRUCTIVELY LEFT WITHOUT COUNSEL DURING A CRITICAL STAGE OF THE PROCEEDINGS AGAINST HIM.
¶ 40. At the outset, both the Fifth Circuit Court of Appeals and the United States District Court for the Northern District of Mississippi addressed this matter in Crawford’s federal habeas corpus petition concerning his capital-murder conviction. In denying Crawford habeas relief, both courts found that, while the February 2, 1993, competency evaluation was conducted in violation of Crawford’s Sixth Amendment right to counsel, with respect to the capital-murder charge, the error was harmless. See, respectively, Crawford v. Epps, No. 3:04-cv-00059, 2012 WL 3777024 (N.D.Miss. Aug. 29, 2012), and Crawford v. Epps, 531 Fed.Appx. 511 (5th Cir.2013). In our discussion of this issue, we relate some of the federal district court’s .and the. Fifth Circuit’s findings, based upon extensive discovery conducted by the district court in the matter.
¶41.. On January 29, 1993, the day Kristy D. Ray .(the victim in the, capital-murder .case) was reported missing from her parents’ home, Crawford’s family members found a ransom note in their attic and contacted Fortier. Crawford was out on bond from the aggravated-assault and rape charges at the time of Kristy’s disappearance. As mentioned, Crawford was scheduled to stand trial , on the aggravated-assault charge on February 2, 1993. Crawford previously had filed a notice of his intent to pursue an insanity defense in both the , aggravated-assault and rape cases, and he had submitted to a psychiatric examination at the Mississippi .State Hospital on December 23, 1992. The December evaluation was conducted by Drs. Lott and McMichael, and both doctors concluded that Crawford was malingering as to memory deficits, that he knew right from wrong, and that he was competent to stand trial.
¶ 42. After- receiving the ransom note and becoming fearful of what Crawford might do, Fortier contacted law-enforcement officials. Crawford was located and arrested on January 30, 1993, a Saturday. Prior to questioning by law-enforcement officials, .Crawford waived his right, to counsel. Crawford subsequently confessed involvement in Kristy’s disappearance *914 and led officials to her body. Crawford gave additional statements to law-enforcement officials on February 1 and February 2,1993. Warrants issued for his arrest on capital-murder and related charges on Monday, February 1,1993.
¶ 43. Because of his participation in the' events leading to Crawford’s arrest for Kristy’s murder, Fortier moved to withdraw as counsel in the aggravated-assault and rape cases on February 1,1993. Fortier asserted that he was operating under a conflict of interest' and there existed “no way that he c[ould] "set aside his prejudiced feelings” and properly represent Crawford due to his belief that Crawford’s involvement - in Kristy’s murder was “coldhearted, ■ calculated, and • premeditated.”
■ ¶44.’ Before ruling' on "the motion, Judge Coleman held a hearing on February 1, 1993, without Crawford present. Following the hearing, Judge Coleman ordered th¿ immediate examination of Crawford by the Forensic Services Unit of the Mississippi State Hospital in order to “proceed to trial” in the aggravated-assault and rape cases. Judge Coleman ordered the examiners to produce a report determining whether Crawford was '“sane and competent to Stand trial.” Fortier did not speak to Crawford prior to the psychiatric evaluation,
¶ 45. The psychiatric evaluation was conducted on February'2, 1993. Prior to the evaluation, physicians advised Crawford as to the nonconfidential nature of the examination, arid of his Miranda rights.[4] Crawford, 531 Fed.Appx. at 517; Crawford v. Epps, 2008 WL 4419347, *13 (N.D.Miss. Sept. 25, 2008), vacated in part by Crawford v. Epps, 353 Fed.Appx. 977, 994 (5th Cir.2009) (with instructions to develop the record, if necessary, and reconsider the merits of Crawford’s Sixth Amendment claim.)
¶4,6. In addressing Crawford’s habeas claim after remand, both the district court and the Fifth Circuit found that Crawford was without counsel in the capital-murder case. Fortier had been retained by Crawford in both the aggravated-assault and rape cases, but not in the capital murder case, Crawford, 531 Fed.Appx. at 517-18. The Fifth Circuit reiterated that the Sixth Amendment is offense-specific and is not waived merely because the defendant employs a defense of mental incapacity. Id. (citations omitted). According to the Fifth Circuit, “[b]ecause Fortier was not retained to represent Crawford in the capital murder charge and, in any event, had filed a motion to withdraw altogether, there was ho counsel who could be ‘notified in advance’ about the scope of the examination, and no counsel to assist Crawford ‘in making the significant decision of whether to submit to the examination and to what end the psychiatrist’s findings ■ could be employed.’” Id. at 518 (quoting Estelle v. Smith 451 U.S. 454, 471, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981)). Because Crawford was required to undergo a psychiatric examination on February 2 without the guiding hand of counsel, his Sixth Amendment rights were violated with respect to the capital-murder charge. Id. (citation and quotations omitted).
1Í47. The Fifth Circuit explained the law in this area as follows: “[T]here is no Sixth Amendment right to have an attorney present during a psychiatric evaluation.” Id. at 517 (citing Estelle, 451 U.S. at 470 n. 14, 101 S.Ct. 1866). A criminal defendant, however, has a right to counsel’s assistance “in making the significant decision of whether to submit to the psychiatric examination and to what end the *915 psychiatrist’s findings could be employed.” Id. (quoting Estelle, 451 U.S. at 471, 101 S.Ct. 1866). “Defense counsel must have been given prior notification of the nature and scope of the examination, and an opportunity to consult with the defendant about the uses to which the examination could have been put.” Id. (citing Estelle, 451 U.S. at 471, 101 S.Ct. 1866). Quoting the Third Circuit Court of Appeals, the Fifth Circuit related the doctrine as follows:
Before submitting to a compelled psychiatric interview, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified. The warnings must advise the defendant of the “consequences of ■ foregoing” his right to remain silent..'.. The Fifth — but not Sixth — Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings However,-the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes.
Id. (quoting Gibbs v. Frank, 387 F.3d 268, 274 (3d Cir.2004) (footnote and citations omitted)).
¶ 48. Despite the Sixth Amendment violation that occurred with respect to Crawford’s capital-murder charge, the federal courts, as mentioned, found the violation harmless. Both courts determined that the State had presented sufficient evidence to the jury to uphold Crawford’s capital-murder conviction and sentence, and that it did so without the need for the February 2 evaluation. The Fifth Circuit said:
We agree with the district court that, taking all of the facts into account, the Sixth Amendment violation that occurred as a result of the February 2 evaluation did not have a “substantial and injurious influence or effect” on the verdict. See Brecht [v. Abrahamson], 507 U.S. [619,] 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 [(1993)]. Drs. Lott and McMichael also examined Crawford in December 1992, and Dr. Lott conducted two additional examinations between the February 2 evaluation and Crawford’s capital murder trial while Crawford was represented by counsel. The clinical opinions reached as a result of the February interview were substantially similar to those reported in December-1992, and also conformed with the results of the latter two evaluations (which Dr. McMichael evaluated and reviewed prior to testifying). The doctors consistently found' that Crawford was malingering his memory defects, that his claims of incapacity were neither credible nor consistent with his actions at the time of the crime, and that he was a dangerous individual with a history of aggressive behavior.
Crawford, 531 Fed.Appx. at 519-20.
¶ 49. Notably, both the federal district court and the Fifth Circuit, opined that “use of the [February 2] evaluation during [either the aggravated assault or rape] trial[s], would not have offended Crawford’s Fifth or Sixth Amendment rights.” Id. (quoting Crawford, 353 Fed.Appx. at 982). Both courts found that “[a]t the time Fortier approved the examination, he was acting as counsel to Crawford in his aggravated assault and rape trial[s]. Crawford was advised of his Miranda rights by the examining physicians, and he planned to .initiate a trial defense of mental incapacity or disturbance.” Id.
¶ 50. We agree. As the federal courts found, Crawford had planned to initiate an insanity defense in the rape case and was evaluated by Drs.-Lott and McMichael in *916 December 1992. No contention or showing has been made that Crawford was not informed or counseled as to his rights pri- or to that examination. Indeed, Crawford was specifically warned prior to the February evaluation that the report generated as a result of the examination would be disclosed, and Crawford was reminded “of his right not to say anything which might incriminate him in a court of law.” Crawford, 2012 WL 3777024, *9. When Fortier signed off on the February 2 competency-evaluation order, he was still acting as counsel to Crawford in his rape charge, irrespective of his pending motion to withdraw from the case. “When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.” Mississippi Rules of Professional Conduct Rule 1.16. Though, as the federal district court found, Fortier did not speak to Crawford prior to the February 2 evaluation, Crawford was readvised of his Miranda rights by physicians and of the non-confidential nature of the examination. Crawford, 2008 WL 4419347, *13.
¶ 51. Even if we were to disagree with the federal courts and find that the February 2 competency evaluation was conducted in violation of Crawford’s Sixth Amendment right to counsel, with respect to the rape charge, we would hold the violation to be harmless-for the same reasons the Fifth Circuit found the constitutional violation, with respect to the capital-murder charge, was harmless. See, e.g., Satterwhite v. Texas, 486 U.S. 249, 257, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). As the Fifth Circuit found, Drs. Lott and McMichael also examined Crawford in December 1992, and the record before us indicates that at least one additional competency evaluation was conducted between the February 2 evaluation and the rape trial. The clinical opinions reached as a result of the February 2 evaluation were substantially the same as those reported in the other evaluations. Since Crawford was evaluated in December 1992 and was warned that the report generated as a result of the examination would be disclosed, he could have anticipated that testimony would be introduced to rebut his insanity claim were he to pursue an insanity defense. As the Fifth Circuit found, in choosing to pursue an insanity defense, Crawford “made the ‘significant decision’ regarding the psychiatric evaluation, and cannot complain that he was denied the effective assistance of counsel prior to the examination because he was unable to consult with his attorney as to whether to submit to a psychiatric examination.” Crawford, 531 Fed.Appx. at 521 (quoting Vardas v. Estelle, 715 F.2d 206, 211 (5th Cir.1983)); see also Rivera v. Collins, 934 F.2d 658, 661-62 (5th Cir. 1991) (“Once [the defendant] raised an insanity defense, the state had the right to require that [he] be examined by a state psychiatrist outside the presence of his counsel.... The relevant consultation between [the defendant] and [his counsel] thus occurred at the time that [the defendant] decided to raise the defense.”).
¶ 52. Here, there was more than sufficient evidence apart from the results of the February 2 evaluation, upon which the jury could base its verdict that Crawford was guilty of rape. Crawford was aware of this evidence, and he chose to pursue his insanity defense, knowing the evidence would be introduced. See, e.g., Crawford, 531 Fed.Appx. at 521 (finding same with regard to Crawford’s capital-murder conviction and death sentence). We are more than satisfied that the February 2 evaluation, standing alone, did not contribute to the verdict.
¶53. The dissent authored by Justice Coleman finds that this case must be reversed because there was an actual conflict of interest. We do not.
*917 ¶ 54. The Coleman dissent relies primarily on our decision in Kiker v. State, 55 So.3d 1060 (Miss.2011), a case which the dissent acknowledges is based on a different conflict. In Kiker, we reversed Julius Wesley Kiker’s conviction, having found that defense counsel’s concurrent representation of the State’s witness amounted to an actual conflict of interest that the defendant did not waive. Id. at 1067-68. In reaching our holding, we said that:
When the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of as a matter of law, and “reversal is automatic irrespective of a showing of prejudice unless the accused knowingly and intelligently waived his constitutional right to conflict free representation.” Armstrong v. State, 573 So.2d 1329, 1331 (Miss.1990). Thus, the standard set out in Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), requiring a showing of “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different,” is inapplicable to cases when the deféndant’s attorney “actively represented ■ conflicting interests.” Mickens v. Taylor, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).
Kiker, 55 So.3d at 1066.
¶ 55. As the Coleman dissent correctly observes, this is strong rhetoric, which upon further reflection, we now find imprecise,
¶ 56. Four seminal Supreme Court cases deal with actual conflicts of interest with regard to the Sixth Amendment: Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978);[5] Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980);[6] Wood v. Georgia, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981);[7] and Mickens, 535 U.S. 162, *918 122 S.Ct. 1237, 152 L.Ed.2d 291. All of these cases concern a lawyer’s conflict of interest solely on representation of multiple clients. The standard that has emerged dealing with such conflicts comes from Cuyler, which held that prejudice is presumed when counsel is- burdened by an actual- conflict of interest, but only if the defendant can demonstrate that counsel “actively represented conflicting interests”- and that -“an actual conflict of interest adversely affected his lawyer’s performance.” Strickland, 466 U.S. at 692, 104 S.Ct. 2052 (quoting Cuyler, 446 U.S. at 345-50, 100 S.Ct. 1708). This test sets a lower threshold for reversal of a criminal conviction than does the Strickland test, which requires the defendant establish that counsel’s representation fell below an objective standard of reasonableness and resulted in' prejudice. Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052.
1Í 57. The Strickland Court explained the reason for this distinction as follows:
One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In Cuyler v. Sullivan, 446 U.S. at 345-350, 100 S.Ct. at 1716-1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those'circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel’s duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts, of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e.g„ Fed. Rule Crim. Proc. 44(c), it is reasonable -for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel “actively represented conflicting interests”' and that “an actual conflict of interest adversely affected his- lawyer’s performance.” Cuyler v. Sullivan, supra, 446 U.S. at 350, 348, 100 S.Ct. at 1719, 1718 (footnote omitted).
Strickland, 466 U.S. at 692, 104 S.Ct. 2052.
¶ 58. As recognized in Armstrong, this Court adopted the Cuyler standard in Stringer v. State, 485 So.2d 274 (Miss. 1986), where it held “[i]n order to demonstrate a -violation of his Sixth Amendment Rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer’s performance.” Armstrong, 573 So,2d at 1333.
¶59. Like Holloway, Cuyler, Wood, and Mickens, the conflict in Armstrong concerned multiple representation. The Armstrong■ Court reversed the defendant’s conviction because it found that-an actual conflict of interest which adversely affected counsel’s performance had been demonstrated, and the trial court reasonably should have known this conflict existed but failed to so inform’ the defendant. Armstrong, 573 So.2d at 1334. Wrongly, at the conclusion of its opinion, the Armstrong Court used language that suggested reversal is automatically required only upon a showing that an actual conflict exists in the case. This was a misstatement of Mississippi law. The Armstrong Court did not overrule Stringer, and it applied the Cuyler standard, adopted by Stringer, to the case before it,. .
¶ 60. Similar to Armstrong, Kiker also . involved a multirepresentation conflict, *919 though, of a different sort. In Kiker, one of the defendant’s trial counsel was also representing a key witness for the State in another, unrelated criminal case. Kiker, 55 So.3d at 1063. Though we cited Cuyler, we made no mention of the Cuyler standard. Instead, as mentioned above, we quoted from Armstrong, where it was said that, “[w]hen the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of counsel as a matter of law, and ‘reversal is automatic irrespective of a showing of prejudice unless the accused knowingly and intelligently waived his constitutional right to conflict free representation.’” Kiker, 55 So.3d at 1066. Even though we did not refer to the Cuyler standard, we applied it nonetheless by explaining how the actual conflict of interest affected counsel’s performance.'
Barnett owed a duty of loyalty both to Kiker and to [Bobby] Crawford, a duty that was impossible to fulfill if one of his clients was offering testimony against the other. As Crawford’s attorney, Barnett had the duty to advise Crawford, who was facing criminal charges .of his own, of his right against self-incrimination. Barnett also had the duty to counsel Crawford in his decision of whether to testify against Kiker. On the other hand, as Kiker’s attorney, Barnett was charged with attacking Crawford’s credibility, which would have included an inquiry into Crawford’s criminal background, and his current circumstances, with which Barnett should have been intimately familiar. Barnett could not have acted as a zéalous advocate for Kiker without disclosing information about Crawford which he gained as Crawford’s lawyer. Likewise, Barnett could not have acted as an advocate for Crawford after seeking, on behalf of Kiker, to undermine Crawford’s credibility.
Kiker, 55 So.3d at 1067.
¶ 61. In the instant matter, we are not presented with a multiple-representation conflict. Rather, we are faced with a conflict between a lawyer and his client.
¶62, We. point, out- that in Beets v. Scott, 65 F.3d 1258 (5th Cir.1995), the Fifth Circuit rejected extending the Cuyler standard beyond multiple-representation cases and held that the Strickland test, rather than the Cuyler test, offers superior framework for addressing conflicts outside the multiple-client context. Beets reasoned that “in the absence of controlling authority, we must decide whether, when a lawyer places his self-interest above that of the client, the resulting conflict deserves Cuyler’s ‘not quite per se’ rule of prejudice or Strickland’s more deferential standard of attorney competence.” Id. at 1269. Beets said that “only in the multiple representation - context is the duty of loyalty so plain.” Id. at 1270. But “[w]here the obligation to a single client is concerned, the duties of loyalty and competence are intertwined.” - Id. at 1270, And “when the duty of loyalty is challenged by an attorney’s self-interest, the range of possible breaches .... is virtually limitless,” ranging “from wholly benign to devastating.” Id. at 1271. Thus, according to Beets, “[a]pplying a near-per se rule of prejudice to this spectrum of potential ethical problems is a draconian remedy.” Id.
¶ 63. Beets concluded that “[i]f Cuyler’s more rigid rule applies to attorney breaches of loyalty outside the multiple representation context, Strickland’s desirable and necessary uniform standard of constitutional ineffectiveness will be challenged.” Id. at 1272. What would result would be an “uncertain boundary between Cuyler and Strickland, [and] the focus of Sixth *920 Amendment claims would tend to shift mischievously from the overall fairness of the criminal proceedings — the goal of ‘prejudice’ analysis — to slurs on counsel’s integrity — the ‘conflict’ analysis.” Id.
¶ 64. Here, we need not decide whether Cuyler’s or Strickland’s standard should apply to these types of personal conflicts. The one presented to us today fails under both. For reasons already explained, Crawford was not prejudiced by the February 2 evaluation. And there is no showing whatever that the attorney’s personal conflict in the matter had any adverse affect on his legal representation of Crawford.
¶ 66. For these reasons, we find this issue is without merit.
III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN, OVER CRAWFORD’S OBJECTION, IT GAVE A JURY INSTRUCTION THAT IMPROPERLY SHIFTED THE BURDEN OF PROOF IN VIOLATION OF CRAWFORD’S CONSTITUTIONAL RIGHTS.
¶ 66. On this issue, we acknowledge that, while jury instruction S-8 mirrors language this Court has used to describe the M’Naghten[8] test, the instruction, standing alone, could be confusing on the question of who bears the burden of proof on the issue of insanity. We disagree with Crawford and the dissent authored by Presiding Justice Dickinson, however, that this instruction hopelessly conflicts with jury instruction S-4, which properly informed the jury that the State bears the burden to prove sanity beyond a reasonable doubt.
¶ 67. This- Court has said multiple times that, “In Mississippi to establish the defense of insanity, it must be clearly proved that at the time of committing the act the party accused was laboring under such defect of reason from disease of mind as to not know the nature and quality of the act he was doing or, if he did know it, that he did not know it was wrong.” White v. State, 542 So.2d 250, 252 (Miss.1989) (citing United States v. McCracken, 488 F.2d 406 (5th Cir.1974); Edwards v. State, 441 So.2d 84 (Miss.1983); Palmer v. State, 427 So.2d 111 (Miss.1983)). This standard was first announced in the landmark case of Regina v. M'Naghten, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843), where it was stated that “the jurors ought to be told ... that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did not know it, that he did not know he was doing what was wrong.” Clark v. Arizona, 548 U.S. 735, 747, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006) (quoting M’Naghten, 10 Cl. & Fin at 210, 8 Eng. Rep., at 722).
¶ 68. Thirty-six years after M’Naghten, this Court, in Cunningham v. State, 56 Miss. 269 (1879), noted that three theories had since emerged among the courts and legal writers as to who should bear the burden at trial in proving (in)sanity. Cunningham explained:
Three distinct theories are held by. courts and text-writers of the highest character, and each may be supported by a long array of respectable authorities, viz.: 1. The prisoner must prove his insanity beyond a reasonable doubt. 2. He must establish it by a preponderance *921 of evidence. 3. He must raise a reasonable doubt as to his sanity.
The first of these views receives most countenance from English adjudications and text-books; .the second is supported by a majority of the American eourts; while the third, though held as yet perhaps by a minority of the adjudged cases, is gaining in favor, is the well-settled law in many of the States, and is supported by a power of reasoning which we deem convincing.

Id.

¶ 69. Settling on the third theory, Cunningham held as follows:
We think the true rule is this: Every man is presumed to be sane, and, in the absence of testimony engendering a reasonable doubt of sanity, no evidence on the subject need be offered; but whenever the question of sanity is raised and put in issue by such facts, proven on either side, as engender such doubt, it devolves upon the State to remove it, and to establish the sanity of the prisoner to the satisfaction of the jury, beyond all reasonable doubt arising out of all the evidence in the case.

Id.

¶70. From Cunningham, the. rule in Mississippi is that there is a presumption in every criminal case the accused is sane. White v. State, 542 So.2d 250, 252 (Miss. 1989). “Therefore, the burden is initially on the accused to introduce evidence creating a reasonable doubt as to his sanity at the time of the act.” Id. Once the accused has overcome this initial burden, the burden shifts to the State to present sufficient evidence to prove the accused’s sanity beyond a reasonable doubt. Id. -
¶71. The language contained in jury instruction S-8, “to establish a defense on the ground of insanity, it must be clearly proved ...,” is, in the context of White, et al., actually a legal precept and/or charge for the courts with regard to sufficiency-of-the-evidence determinations. As the Fifth Circuit opined in McCracken, supra:
Once raised, the question of the defendant’s sanity will normally be for the trier of fact to resolve, but at three different points the court may face the question of the'sufficiency ..of the evidence as a matter of law. Initially, of course, the court must always determine whether the defendant has presented enough evidence to put his sanity in question. See United States v. Holt, 450 F.2d 868 (5th Cir.1971). The court must also determine whether the Government’s evidence is sufficient to make an issue for the jury on the defense of insanity and thus avoid a directed verdict of acquittal. Finally, in the event of a guilty verdict, the court must decide whether the Government’s evidence is sufficient to support the conclusion of the trier of fact as to the defendant’s sanity at the time of the offense. United States v. Collier, 453 F.2d 1173, 1176-1177 (5th Cir.1972); Gordon v. United States, 438 F.2d 858, 885 (5th Cir.1971), cert. denied, 404 U.S. 828, 92 S.Ct. 142, 30 L.Ed.2d 56 (1971)[.]
McCracken, 488 F.2d at 409.
¶ 72. McCracken went further with the following:
This court has never precisely defined the quantum of evidence necessary to constitute sufficiency for each of these determinations, though the level obviously rises from the first to the third. Indeed exact quantification, even if possible, would probably be undesirable. Instead, through the painful process of case-by-case adjudication we have educed a set of general principles to guide both' the trial court in exercising its role of weighing the evidence as a matter of law and the appellate court in reviewing that exercise. Foremost among these principles is the realization *922 that “each [case] must- be decided upon ■its own facts with careful attention to the weight of the evidence on each side.” Nagell v. United States, 392 F.2d 934, 937 (5th Cir.1968).
¶ 73. ' Likewise, this ■ Court has never delineated the quantum- of evidence necessary to constitute sufficiency for either the accused’s or the State’s evidentiary burden in such cases. ' Rather, this Court has held simply that the test as to whether an issue regarding defendant’s sanity should be submitted to the jury is whether the acts and conduct of the defendant and the opinions of the witnesses would-be reasonably calculated to raise reasonable doubt in the mind of any of the jurors regarding - the defendant’s - sanity.- Waycaster v. State, 185 Miss. 25, 187 So. 205, 208 (Miss.1939). We point out that the Waycaster Court said it is proper for the jury to be advised of this legal test under proper instructions as to the measure of proof required to support the plea of insanity in the light of the facts and circumstances testified to and the opinions expressed by 'the witnesses.
¶ 74. As mentioned, we agree that jury instruction S-8 could be interpreted bythe jury to say that the burden of proving insanity lies with the accused. And the instruction also fails to inform that all that is required of.an accused is to present sufficient evidence creating a reasonable doubt as to his sanity at the time of the act. But, although instruction S-8 imperfectly stated the law,, we find, that, when the instruction is read in conjunction with jury instruction S-4, the jury was adequately instructed. See Hornburger v. State, 650 So.2d 510, 515 (Miss.1995) (finding that where a jury instruction imperfectly stated the law, the instruction was harmless error when read with other, instructions provided)..
¶ 75. Jury instruction S-4 reads as follows:
The [cjourt instruet[s] the jury that if you find that the State of Mississippi has proved beyond a reasonable doubt all the essential elements of rape as set forth.in Jury Instruction S-2, then you must find’the defendant -.guilty of rape, unless- the State of Mississippi has failed to prove beyond a reasonable doubt that the defendant' ... was - sane at the time the defendant committed the rape. \
In order to prove the defendant ... was sane at the time he committed the rape the State of Mississippi must prove beyond a reasonable doubt that at the time of the commission of the rape the defendant ... had the mental capacity to realize and .appreciate the nature and quality of his actions and to distinguish between right and wrong with reference to the actions he committed.
If after considering all of the evidence in this case you find the State of Mississippi has failed to prove beyond a reasonable doubt that the defendant was sane at the time of the commission of the rape, .then your verdict under Count I of the indictment must be not guilty by reason of insanity.
¶ 76. Instruction S-4 properly informed the jury the State — not Crawford- — had the burden of proving the sanity issue. We find that the jury was adequately— although not perfectly — instructed. And we are convinced that Crawford was not denied a fair trial because of jury instruction S-8.
IV. WHETHER CRAWFORD’S CONSTITUTIONAL RIGHTS WERE VIOLATED BY A SEARCH OF HIS HOME BY LAW-ENFORCEMENT OFFICIALS WITHOUT A WARRANT.
¶ 77. Crawford contends that most of the physical evidence in this case was *923 obtained through an illegal search and should have been suppressed. We find no merit in his contention. .
¶78. In determining whether evidence should be suppressed, a' trial court’s findings of fact will not be disturbed on appeal absent a finding the trial court “applied an incorrect legal standard, committed manifest error, or made a decision contrary’to the overwhelming weight of the evidence.” Simmons v. State, 805 So.2d 452, 482 (Miss.2001) (quoting Taylor v. State, 733 So.2d 251, 255 (Miss.1999)). “As a general rule, our state and federal Constitutions prohibit searches without a valid warrant unless an exception applies.” Galloway v. State, 122 So.3d 614, 669 (Miss.2013). Such exceptions typically include a consensual search, a search incident to arrest, an inventory search, and a search under exigent- circumstances if probable cause exists. Id.
¶ 79. ’ Here, we agree with the State that the search was legal as an emergency search under exigent-’circumstances. In such instances, three elements must be met: (1) there are reasonable grounds to believe that an emergency situation exists and that there is an immediate need for police assistance in order to protect life and property; (2) the primary motivation for the search is not to make ■ an- arrest and/or to seize evidence, and (3). there is some reasonable basis, approximating probable capse, to associate the emergency with the area or placed searched. Baker v. State, 802 So.2d 77, 79 (Miss.2001).
¶ 80. There is no dispute that the exigent-circumstances doctrine applied when the deputies first entered the Crawford’s residence. Based upon information Nicole provided, the deputies reasonably believed Sue’s life and safety were in danger, and their primary motivation for the, search was to locate Sue. Both Crawford and the-dissent authored by Justice Kitchens, however, take issue- with evidence seized the second time deputies entered Crawford’s residence and contend that- it constituted an illegal- search and seizure. We' dis- • agree.
¶ 81. In Baker, this Court, relying on Taylor v. State, 733 So.2d 251 (Miss.1999) and Smith v. State, 419 So.2d 563, 570 (Miss.1982), overruled on other grounds by Willie v. State, 585 Sp.2d 660, 681 (Miss. 1991), held that.“when police are.properly authorized to enter a dwelling under the exigent circumstances doctrine, they are also authorized to return and take physical evidence that was in plain view during the initial search, which they could have seized at the time but for the emergency situation that allowed, them to enter the dwelling in the first place.” Baker, 802 So.2d at 80.
¶ 82. In Taylor, police entered a house in which a victim had been fatally burned by her boyfriend. Taylor, 733 So.2d at 254. One officer walked through the house and then left briefly to search for the boyfriend-. Id. The- officer returned to the house with a camera to take pictures of the scene. Id. Approximately- forty-five minutes later, police walked through the house a third time, collecting various pieces of physical evidence. Id. The Taylor Court upheld the search’s constitutionality, relying and quoting from the reasoning this Court applied in Smith, .as follows:
From the time of their initial entry, the officers of the Jackson Police Department were engaged in only one search. That search had only one goal: locating [the victim] (and assisting her, if not too late). The actions of [the officer] and other -members- of the mobile crime lab (after ‘the re-entry of the apartment) were merely to effectuate the physical seizure of. articles in plain view which [the officers] would have been -able to seize had not the circumstances been so “exigent.” There was no unwarranted *924 delay in time, nor was there any expansion of the scope of the search. The fact that the actual physical taking of the items into the custody of the police was effectuated by an evidence technician who was trained to preserve the eviden-tiary value of the objects, rather than by the first officers to view the objects, is not significant.
Taylor, 733 So.2d at 256 (quoting Smith, 419 So.2d at 572, cert. denied, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983)).
¶ 83. We find that the same reasoning applies here.
¶84. Deputy Gregg Hopper testified that when he, and Deputy Tommy Story, and Constable Leroy Dereck arrived at Crawford's residence, they all entered the house and made a quick pass through the entire residence looking for Sue. Seeing that Sue was not inside the house, they went to the back door, which was open. There, they noticed what appeared to be blood drippings on the steps leading from the back of the house into the yard. Hopper and Story “started across the yard at the southeast corner of the house.” Outside, they noticed footprints and a piece of duct' tape on the ground with what appeared to be hair on it. . Hopper and Story followed the footprints to a nearby abandoned house, which they searched and found neither Sue nor Crawford. Dereck, who had remained inside Crawford’s residence while Hopper and Story followed the footprints, soon exited Crawford’s residence and went over to the abandoned house. Hopper and Story returned to Crawford’s residence, where they saw Crawford’s grandfather, Dewey Crawford. Dewey provided Story with a description of Crawford’s truck. Story got on the radio and relayed the information to a dispatcher. While Story was on the radio, Hopper went back inside Crawford’s residence and “started collecting evidence.”
¶ 85. The first piece of evidence Hopper obtained was a tampon, which appeared to have blood stains on it. Hopper found the tampon laying on top of a bed located in the residence’s front bedroom. Next, Hopper obtained a roll of duct tape, which he found laying on the kitchen table. Hopper also found strippings of duct tape with what appeared to be hairs on it. The strippings were located next to the roll of duct tape on the kitchen table. Hopper next took a quilt that covered the bed where the tampon was found. According to Hopper, it took them approximately thirty to forty-five minutes to collect all the evidence.
¶ 86. On cross-examination, Hopper was asked why he did not obtain a search warrant before going back into Crawford’s residence a second time. Hopper replied that this was an emergency situation. Sue was still missing and they had only a couple of officers available looking for Sue. Hopper said they did not have time to obtain a search warrant and did not have anyone available to leave at the scene to watch the house until a search warrant could be obtained.
¶ 87. Very similar to the circumstances in Smith, from the time they first entered Crawford’s residence, the officers had one ambition-locating Sue and “assisting her, if not too late.” Smith, 419 So.2d at 572. The actions of Hopper and/or the other two officers upon reentering Crawford’s residence were “merely to effectuate the physical seizure of articles in plain view which the officers would have been able to seize” when they first entered Crawford’s residence “had not the circumstances been so ‘exigent.’ ” Id. There was no unwarranted delay in time when the officers reentered Crawford’s residence, and “nor was there any expansion of the scope of the *925 search.” Id. The fact that the officers did not seize the complained-of items of evidence during their first entry of Crawford’s residence, “is merely evidence of the exigency of the particular circumstances” of this case. Id. at 574.'
¶88. Citing Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Kitchens dissent contends we are deviating from that Court’s interpretation of the Fourth Amendment, and decreasing the protection Mississippi citizens enjoy under that amendment. Not so.
¶ 89. First, the Mincey Court addressed “only the scope of the primary search itself, and was not overruling by implication the many cases acknowledging that the ‘plain view’ doctrine can legitimate action beyond that scope.” Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). Second, the Mincey case is factually distinguishable from the case before us on nearly every facet. In Mincey, several officers entered an apartment where a drug sale had been arranged. One officer charged into a bedroom, and gunshots were exchanged. The officer was hit and later died. The only other person in the bedroom was Mincey. Approximately ten minutes after the shoot-out, homicide detectives took over the scene. They conducted a four-day search of the entire apartment, which included opening drawers, closets, and cupboards and inspecting their contents, emptying clothing pockets, and pulling up sections of carpet. The officers inspected every item in the apartment and seized several hundred items of evidence. The Arizona Supreme Court upheld the search under a “murder scene exception.” As we recognized in Baker, a unanimous United States Supreme Court rejected this broad “murder scene” exception to the warrant requirement. The Supreme Court, however, reaffirmed the emergency aid exception to the warrant requirement:
We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. Cf. Michigan v. Tyler, 436 U.S. 499, 509-10, 98 S.Ct. 1942, [56 L.Ed.2d 486] (1978). “The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.” Wayne v. United States, 318 F.2d 205, 212 (D.C.1963)(opinion of Burger, J.). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. Michigan v. Tyler, supra, 436 U.S., at 509-510, 98 S.Ct., at 1950-1951; Coolidge v. New Hampshire, 403 U.S., [443] at 465-466, 91 S.Ct., [2022] at 2037-2038[, 29 L.Ed.2d 564 (1971) ].
Mincey, 437 U.S. at 392-93, 98 S.Ct. 2408. Consistent with this reaffirmation of the exigent-circumstances doctrine, the Supreme Court concluded its discussion with the statement that “[t]o what extent, if any, the evidence found in Mincey’s apartment was permissibly seized under estaba lished Fourth Amendment standards will be for the Arizona courts to resolve on remand.” Id. at 395 n. 9, 98 S.Ct. 2408.
¶ 90. On remand, the Arizona Supreme Court upheld, under the exigent-circumstances doctrine, the admissibility of the evidence observed in plain view by the homicide detective who responded to the *926 scene ten minutes after the murder. Arizona v. Mincey, 130 Ariz. 389, 636 P.2d 637, 648-51 (1981). The court concluded that the homicide detective’s entry into the apartment “was merely a continuation of the initial emergency entry” by other police officers in response to the shooting, and therefore, the homicide detective “could make plain view seizures ... of evidence he observed in plain view.” Id. at 649. The Supreme Court denied Min-cey’s petition for a writ of certiorari to review this decision, Mincey v. Arizona, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982).
¶ 91. Similarly, courts in other states have* upheld the validity of seizures of evidence observed in plain view at a crime scene to which police responded under the exigent circumstances exception, even when there is some delay between the plain-view observation and seizure of the evidence and the seizure is made by different police officers than the ones who initially responded to the emergency. See, e.g., State v. Brock, 327 S.W.3d 645, 684-85 (Tenn.Crim.App.2009); State v. O'Donnell, 974 A.2d 420, 421-22, 408 N.J.Super. 177, 178-79 (App.Div.2009); Wengert v. State, 364 Md. 76, 771 A.2d 389, 394-401 (2001); Wofford v. State, 330 Ark. 8, 952 S.W.2d 646, 652-54 (1997); Allen v. State, 638 So.2d 577, 578-80 (Fla.Dist.Ct.App.1994) rev. denied, 649 So.2d 232 (table) (Fla. 1994); State v. Tidwell, 888 S.W.2d 736, 740-43 (Mo.Ct.App.1994); State v. Spears, 560 So.2d 1145, 1147-51 (Ala.Crim.App. 1989), cert. denied, (Ala.1990); Hunter v. Commonwealth, 8 Va.App. 81, 378 S.E.2d 634, 635-36 (1989); State v. Magnano, 204 Conn. 259, 528 A.2d 760, 761-66 (1987); State v. Jolley, 312 N.C. 296, 321 S.E.2d 883, 886-88 (1984); State v. Johnson, 413 A.2d 931, 932-34 (Me.1980); State v. Anderson, 42 Or.App. 29, 599 P.2d 1225, 1228-30 (1979), cert. denied, 446 U.S. 920, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980); LaFournier v. State, 91 Wis.2d 61, 280 N.W.2d 746, 748-51 (1979); State v. Martin, 274 N.W.2d 893, 896-97 (S.D.1979).
¶ 92. Here, consistent with Baker, Taylor, and Smith, we find that the second entry into Crawford’s residence constituted a reasonable continuation of the original exigent search. Therefore, we find no error in the trial court’s decision to deny Crawford’s motion to suppress the complained-of items of evidence.
CONCLUSION
¶ 93. The Tippah County Circuit Court’s judgment of conviction of rape and sentence is affirmed.
¶ 94. CONVICTION OF RAPE AND SENTENCE OF FORTY-SIX (46) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN THIS CAUSÉ SHALL RUN CONSECUTIVELY TO THE SENTENCE IN CAUSE NUMBER LK-93-089 IN THE LAFAYETTE COUNTY CIRCUIT COURT. APPELLANT SHALL PAY COURT COSTS IN THE AMOUNT OF $165.00 DUE WITHIN A YEAR OF RELEASE.
WALLER, C.J., RANDOLPH, P.J., LAMAR AND CHANDLER, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.; DICKINSON, P.J., JOINS IN PART. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., KITCHENS AND KING, JJ.

, Sue is a pseudonym adopted to protect the identity of the underage rape victim,

. Sue is Crawford’s ex-sister-law. Crawford was married to Sue's older sister, Janet Roberts. Janet and Crawford divorced and he remarried a woman named Gail Thompson. After having a son together, they also divorced. In April 1991, Crawford began see- , ing Janet again.

, On December 16, 2013, the circuit court entered an order appointing the Office of the State Public Defender, Indigent Appeals Division, to represent Crawford in this appeal. The Public Defender's Office determined that it had a conflict in this case, and therefore contracted with the undersigned counsel under the provisions of Mississippi Code Section 99-40-1(2) to represent Crawford in the appeal of this matter.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. In Holloway, defense counsel representing three codefendants with diverging and potentially conflicting interests moved for the appointment of separate counsel. Holloway, 435 U.S. at 478-80, 98 S.Ct. 1173. The Holloway Court noted that counsel in this situation is effectively gagged from properly representing any one of the defendants, and that it is inherently difficult to measure the degree of harm caused by such conflicts. Id. at 489-90, 98 S.Ct. 1173. The Court found that this type of conflict undermines the fairness and efficacy of the adversarial process, and that automatic reversal was necessary where defense counsel’s objection was denied by the trial court, unless the trial court concludes that there is no conflict. Id. at 488, 98 S.Ct. 1173.

. In Cuyler, the Court addressed the issue of multiple representation where the trial court does not and reasonably should not know of the conflict. Cuyler, 446 U.S. at 345-50, 100 S.Ct, 1708. The Cuyler Court noted that Holloway recognized that “a lawyer forced to represent codefendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment.” Id. at 345, 100 S.Ct. 1708 (citing Holloway, 435 U.S. at 481-82, 98 S.Ct. 1173).The Cuyler Court further developed the joint-representation conflict standard, stating that, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer’s performance,” and that a defendant who makes such a showing is not required to show prejudice in order to obtain relief. Id. at 348, 349-50, 100 S.Ct. 1708.

.In Wood, the Court remanded for proceedings to determine whether there was an actual conflict where the defendants’ lawyer was being paid by the defendants’ employer. Wood, 450 U.S. at 269-72, 101 S.Ct. 1097 (employer owned a business purveying obscene material, and the defendants had been convicted in connection with the business). The defendants' employer had been paying the defendants’ fines, imposed after their conviction for distributing obscenity. Id. at 276, 101 S.Ct. 1097. The Court determined that remand was necessary because "petitioners were represented by their employer’s lawyer, who may not have pursued their interests *918 single-mindedly,” Id. at 271-72, 101 S.Ct, 1097.

. M’Naghten’s Case, 8 Eng. Rep 718, 10 Cl. § F. 200, 1 Car. & BQrw, 130 (H.L.1843).